(99)    February 16, 2002:  PFLP suicide bomber Sadiq Ahed Abdul Hafez blows himself up at the mall in Karnei Shomron, killing three and wounding 25.

Among those injured is plaintiff Ronit Trattner.

(100)   March 5, 2002:  PIJ suicide bomber Abdul Karim Tahaineh detonates at the Afula central bus station, killing one and injuring ten.

Among those injured is Arlet Lesry[†], wife of plaintiff Eliyahu Lesry and mother of plaintiffs Adam Lesry and Adva Lesry*.

(101)   March 7, 2002:  Suicide bomber Shadi Nasar detonates at the entrance to the Eshel HaShomron Hotel in Ariel, wounding 14.   Both AAMB and PFLP issue claims of responsibility.

Among those injured is plaintiff Shlomo Maoz.

(102)   March 12, 2002:  AAMB gunman Munif Abu Bahar fires at a car driving near Katzir in Wadi Ara, injuring the driver, plaintiff Lior Odesser.

(103)   March 17, 2002:  AAMB terrorist Amar Abed Almagig Shahrir opens fire on a Kfar Saba street corner, killing a girl and wounding 16 other civilians.

Among those injured is Adi Bittman[†], daughter of plaintiffs Nili Bittman and Arie Bittman.

(104)   March 31, 2002:  Just after 2:00 p.m on a Sunday afternoon during the Passover holiday, Hamas suicide bomber Shadi Zakariya Rada Tubasi enters the popular Matza Restaurant in Haifa and blows himself up.  The explosion tears the roof off the one-story building and blows out the windows, leaving horrific scenes of people on fire and with severed limbs.  A total of fifteen Israeli civilians are killed and 31 wounded.

Among those killed is:

(a)     Orly Ophir.  Plaintiffs asserting claims related to and/or arising from this death are Shulamit Ophir, mother of decedent; and Roni Ophir and Ilanit Ophir, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Orly Ophir.

(105)   May 28, 2002:  One Israeli is killed and one injured in an AAMB shooting attack on a car near Ramallah.

The individual killed is:

(a)     Albert Mallul.  Plaintiffs asserting claims related to and/or arising from this death are Shachar Mallul, Lior Mallul, and Idan Mallul, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Albert Mallul.

The individual injured is Herzl Mallul[†], father of plaintiffs Nataly Mallul, Adi Mallul, and Linoi Mallul*.

(106)   June 5, 2002:  PIJ suicide bomber Hamza Arif Hussein Samudi drives a car packed with a large quantity of explosives into a No. 830 Egged bus at Megiddo Junction near Afula, killing seventeen people and injuring fifty others.

Among those killed are:

(a)     Shemon Timsit.  The plaintiff asserting claims related to and/or arising from this death is Mona Timsit, mother of decedent.  This individual asserts claims individually and/or as representative of the estate of Shemon Timsit.

(b)     Zvika Gelberd.  The plaintiff asserting claims related to and/or arising from this death is Zehavit Gelberd Barbiro, sister of decedent.  This individual asserts claims individually and/or as representative of the estate of Zvika Gelberd.

Among those injured is plaintiff Yuval Agmon.

(107)   July 26, 2002:  AAMB members stage an ambush attack on two cars traveling near the Zif Junction near Hebron, killing three members of a family and injuring several others.

The individuals killed are:

(a)   Yosef Yaakov Dickstein.  Plaintiffs asserting claims related to and/or arising from this death are Ephraim Yedidyah (individually and as representative of the estate of Yosef Yaakov Dickstein), executor of estate; Shulamit Dickstein, mother of decedent; and Esther Pick and Moshe Dickstein, siblings of decedent.

(b)   Chana Dickstein.  Plaintiffs asserting claims related to and/or arising from this death are Ephraim Yedidyah (individually and as representative of the estate of Chana Dickstein), executor of estate and brother of decedent; Miriam Freund, mother of decedent; and Shulamit Zuckerman, Hanan Freund, and Yitzhak Freund, siblings of decedent.

(c)   Shuvael Dickstein.  The plaintiff asserting claims related to and/or arising from this death is Ephraim Yedidyah (individually and as representative of the estate of Shuvael Dickstein), executor of estate.

The individuals injured are plaintiffs Ayelet Hashachar Dickstein, Shlomo Dickstein, Beniya Dickstein*, Shirel David Dickstein*, and Adiel Yechezkiel Dickstein*.

(108)   October 3, 2002:  Plaintiff Abdel Rahim Balalta is shot and wounded at Sheva Junction.

(109)   October 27, 2002:  Plaintiff Yakov Goita is injured in a shooting on the road between Morag and Neve Dekalim in Gush Katif.

(110)   November 4, 2002:  PIJ suicide bomber Nabil Sawalha explodes at the Harim Mall in Kfar Saba, killing two and wounding seventy.

Among those injured are plaintiff Amir Yaakov, husband of plaintiff Zeava Yaakov and father of plaintiffs Sivan Yaakov, Li Or Yaakov, Nitzan Yaakov*, and Shay David Yaakov*; and plaintiff Ann Reiff, a citizen of Israel and Zimbabwe.

(111)  November 22, 2002:  Hamas gunmen fire on a car traveling on the road between Jerusalem and Kiryat Arba, injuring plaintiff Michael Germadi and his wife, plaintiff Rinat Germadi.

(112)  March 7, 2003:  Hamas terrorists infiltrate Kiryat Arba, killing two and injuring five, including plaintiff Liti Aliza Saied[†], a citizen of Israel and Argentina.

(113)  December 20, 2002:  PIJ gunmen shoot at a car driving through the Kissufim Corridor, killing one.

The individual killed is:

(a)  Rabbi Yitzhak Arama.  Plaintiffs asserting claims related to and/or arising from this death are Karen Arama Cohen, Matitya Arama*, Malachi Arama*, Raaya Arama*, Shira Arama*, and Livnat Arama*, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yitzhak Arama.

(114)  March 4, 2003:  Tanzim operative Mahmoud Hushiyah stabs and wounds a woman at the Arad Bus Station.

The individual injured is plaintiff Natali Afgin, daughter of plaintiff Marsel Afgin.

(115)  May 5, 2003:  AAMB gunmen Kamel Ghanem and Issam Farukh open fire on a vehicle near Morag, killing one and injuring two.

Among those injured is Tamir Dar[†], father of plaintiffs Itael Dar* and Yishai Dar*.

(116)  June 11, 2003:  Hamas suicide bomber Abdul Mu'ati Shabana detonates himself on a bus in Jerusalem, killing seventeen and injuring over 100.

Among those injured are Menashe Chamu[†], father of plaintiffs Batsheva Chamu, Esther Chamu*, and Simcha Chamu*; Shlomo Maarivi[†], husband of plaintiff Meirav Maarivi and father of plaintiffs Mordechai Maarivi, Zahava Maarivi*, Mazal Maarivi*, Chaya Maarivi*, Yosef Chaim Maarivi*, Margalit Maarivi*, Yehudit Maarivi*, Yael Maarivi*, Ayala Maarivi*, Elazar Cohen*, and Yitzhak Moshe Cohen*; and plaintiff Ilana Falek, wife of plaintiff Rachamim Falek.

(117)  June 17, 2003:  A PIJ terrorist sprays a car with bullets near the Kibbutz Eyal junction on the Trans-Israel Highway, killing a young girl and injuring three members of her family.

The individual killed is:

(a)    Noam Leibovitch.  Plaintiffs asserting claims related to and/or arising from this death are Shlomo Leibovitch and Galit Leibovitch, parents of decedent; and Hila Leibovitch and Moshe Leibovitch*, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Noam Leibovitch.

(118)  June 21, 2003:  AAMB member Mahmoud Halila stabs and injures plaintiff Esther Barioty at the Kiryat Ata junction.

(119)  August 29, 2003:  AAMB gunmen ambush and fire upon a vehicle at the Alon intersection, killing a man and injuring his wife.

The individual killed is:

(a)    Shalom Har-Melech.  The plaintiff asserting claims related to and/or arising from this death is Baruch Har-Melech, brother of decedent.  This individual asserts claims individually and/or as representative of the estate of Shalom Har-Melech.

(120)   November 21, 2003:  Two Israelis are shot dead at a construction site near Abu Dis in East Jerusalem.   The Jenin Martyrs' Brigades, an offshoot of AAMB, claims responsibility.

One of those killed is:

(a)   Samer Afaan.  Plaintiffs asserting claims related to and/or arising from this death are Fathi Afaan and Fatima Afaan, parents of decedent; and Wasim Afaan, Muhammad Afaan, Khadija Afaan, Othman Afaan, Islam Afaan*, Mariam Afaan*, Fathia Afaan*, Ahmed Afaan, Salem Afaan, Asia Afaan, and Daud Afaan*, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Samer Afaan.

(121)   December 12, 2003:  An AAMB gunman opens fire on a group of worshippers outside of Joseph's Tomb in Nablus, injuring seven, including Yosef Avhar[†], husband of plaintiff Smadar Avhar and father of plaintiffs Yehonatan Avhar*, Tair Avhar*, and Nachman Avhar*.

(122)   June 28, 2004:  Hamas operatives fire a Qassam rocket into the northern Negev town of Sderot.  The missile hits a nursery school, kills two, and injures eleven more.

Among those injured is Yafim Tzinak[†], husband of plaintiff Chaka Tzinak.

(123)   June 29, 2004:  Hamas militants launch Qassam rockets into Sderot, injuring nine, including Masoudi Suissa[†], wife of plaintiff Avraham Suissa and mother of plaintiffs Oshri Suissa*, Mordechai Suissa, and Yisroel Suissa*.

(124)   July 18, 2004:  Hamas operatives launch a Qassam rocket into Sderot, injuring plaintiff Masoudi Suissa[†], wife of plaintiff Avraham Suissa and mother of plaintiffs Oshri Suissa*, Mordechai Suissa, and Yisroel Suissa*.

(125)   August 2, 2004:  Hamas launches a Qassam rocket at Sderot, injuring four, including plaintiffs Yael Cohen and Michal Cohen.

(126)   August 19, 2004:  Hamas operatives launch two Qassam rockets into Sderot, injuring 25, including plaintiff Dvir Gabbai*.

(127)   September 3, 2004:  Hamas operatives fire a Qassam rocket into Sderot, injuring plaintiff Eliyahu Peretz.

(128)   September 23, 2004:  Hamas operatives launch a Qassam rocket into Sderot, injuring Larissa Charitananko†, mother of plaintiffs Anna Charitananko* and Timor Charitananko*.

(129)   September 29, 2004:  Hamas operatives fire Qassam rockets into Sderot, killing two children and wounding twenty other civilians.

Among those killed is:

(a)   Yuval Ababa.  Plaintiffs asserting claims related to and/or arising from this death are Ilan Ababa and Malmiko Tzagi, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yuval Ababa.

Among those injured are Teresa Abayev†, wife of plaintiff Yitzhak Abayev; and plaintiffs Olga  Leviav† and Yaakov Ayalon Hologarsh.

(130)   October 3, 2004:  Hamas launches a Qassam rocket at Sderot, injuring plaintiffs Linoi Peretz* and Lin Peretz*.

(131)   November 1, 2004:   PFLP suicide bomber Amer al-Farr detonates in the Ha'Carmel Market in central Tel Aviv, killing three and wounding over thirty.

Among those injured is plaintiff Natalia Tolstohina.

(132)   November 3, 2004:  PIJ launches a missile at the Agudat Gaza army base in Gush Katif, injuring Yoav Tal†, father of plaintiff Adi Tal*.

(133)   Hamas launches four Qassam rockets at Sderot, injuring six, including Olga Pelez[†], mother of plaintiff Radion Pelez*.

(134)   January 13, 2005:   Palestinian terrorists Muhannad Abdul Rahman al-Mansi, Samir Muhammad Jeha, and Mahmoud Majdi Muhammad al-Masri activate an explosive device on the Palestinian side of the Karni crossing, infiltrate the Israeli side, and fire at Israeli civilians, killing six and wounding five.   Hamas and AAMB claim joint responsibility.

Among those killed is:

(a)   Dror Gazari.   The plaintiff asserting claims related to and/or arising from this death is Esther Gazari, sister of decedent.   This individual asserts claims individually and/or as representative of the estate of Dror Gazari.

(135)   February 25, 2005:   PIJ suicide bomber Abdullah Said Badran detonates his explosives outside the Stage Club in Tel Aviv, killing five and wounding fifty others.

Among those killed is:

(a)   Itzhak Boozaglo.   Plaintiffs asserting claims related to and/or arising from this death are Linda Boozaglo, wife of decedent; and Masoudi Boozaglo, mother of decedent. Each of these individuals asserts claims individually and/or as representative of the estate of Itzhak Boozaglo.

Among those injured is plaintiff Linda Boozaglo.

(136)   May 25, 2001:   PIJ suicide bombers Ramez Osama Abu al-Hija and 'Ala Sabbah drive an explosives-laden car into the side of a bus near the central station in Hadera.   65 are injured, including plaintiffs Shay Amar, Tzachi Amar, and Shir Amar*, children of plaintiffs Negba Amar and Binyamin Amar.

(137)   February 9, 2002:  Hamas gunmen fire upon a car traveling between Ariel and the Tapuach Junction on the Trans-Samaria Highway, killing an elderly woman and injuring her two sons.

The individual killed is:

(a)   Atala Lipovsky.  Plaintiffs asserting claims related to and/or arising from this death are Victor Lipovsky and Michael Lipovsky, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Atala Lipovsky.

The individuals injured are plaintiffs Victor Lipovsky and Michael Lipovsky.

(138)   March 3, 2002:  AAMB terrorist Taher Hamed opens fire at a roadblock near Ofra, killing ten and injuring six others.

Among those injured are plaintiff Erick Lopez, a citizen of Israel and France, husband of plaintiff Yael Lopez and father of plaintiffs Eytan Lopez, Adam Lopez, and Aviva Shani Lopez*.

(139)   December 2, 1998:  A Hamas lynch mob led by Yusuf Subhi Abu Kumar attacks and stones a vehicle near Ramallah, nearly killing the passengers, among them Asaf Myara[†], son of plaintiff Lisa Myara, a citizen of Israel and the United Kingdom.

(140)   August 30, 2001:  A masked AAMB gunman approaches an Israeli man dining with friends in the village of Na'alin, shoots him in the head at point-blank range, and kills him.

The individual killed is:

(a)   Amos Tajouri.  Plaintiffs asserting claims related to and/or arising from this death are Yehudit Tajouri, wife of decedent; and Joseph Tajouri, Galit Tajouri Moshe, and Baruch Tajouri, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Amos Tajouri.

(141)  November 27, 2001:  Hamas operatives attack a convoy at Gush Katif with grenades and gunfire, killing one and injuring three.

The individual killed is:

(a)    Esther Fahima.  The plaintiff asserting claims related to and/or arising from this death is Geula Ben Itzhaki, sister of decedent.  This individual asserts claims individually and/or as representative of the estate of Esther Fahima.

(142)  March 12, 2002:  AAMB gunmen fire at a vehicle at the Kiryat Sefer checkpoint east of Modi'in Ilit, killing one civilian and injuring another.

The individual killed is:

(a)    Eyal Liberman.  Plaintiffs asserting claims related to and/or arising from this death are Idit Liberman, wife of decedent; and Tomer Liberman* and Alon Liberman*, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Eyal Liberman.

(143)  August 12, 2001:  PIJ gunman Mahmoud Farajala opens fire near Kiryat Gat, wounding plaintiff Ruth Mor.

(144)  January 17, 2000:  A pipe bomb hidden in a trashcan by PIJ operatives explodes in Hadera, injuring 21, including plaintiff Shiraz Sarusi, daughter of plaintiffs Benny Sarusi and Tivka Sarusi.

30.    Plaintiffs, who were civilians, were injured and/or their decedents were killed in these terrorist attacks.

31.    Defendant knew or should have known that the funds deposited in the accounts established and maintained by it, or otherwise belonging to, disbursed by or under the control of it, were used to support, encourage, entice and make possible these suicide bombings and other

murderous attacks in that Defendant established, maintained and administered an elaborate and highly organized program to make financial payments to the families of Palestinian "martyrs," including suicide bombers and other genocidal murderers and maimers, and to Foreign Terrorist Organizations and their front organizations.

## **Defendant**

32.    Arab Bank is a Jordanian banking institution with a branch office for the transaction of business located at 520 Madison Avenue, New York, New York. Arab Bank conducts business in, and is registered to conduct business under, the laws of the State of New York. It has operated a federally chartered branch in New York for over twenty years. The New York branch is designated as a wholesale bank, and among the banking and financial services that it conducts in New York is the provision of clearing and correspondent bank services to its foreign bank branch offices and affiliated banking institutions that are also owned and/or controlled by the Arab Bank Group as well as other foreign banks.

33.    Arab Bank is also one of the largest financial institutions in the Middle East. Headquartered in Jordan, it operates through a global network of more than 400 branches and offices in over twenty-five countries. Arab Bank maintains a business presence in every Arab country where private banking is permitted, as well as twenty-two local branches throughout the West Bank and Gaza Strip. Arab Bank also benefits from and operates through its various sister institutions, subsidiaries, and affiliates, which collectively make up the "Arab Bank Group". To this end, Arab Bank owns a 40% interest in Saudi Arabia's Arab National Bank.

## JURISDICTION AND VENUE

34.     Jurisdiction arises pursuant to 28 U.S.C., §1331 and §1332(a)(2).  Jurisdiction also arises pursuant to 28 U.S.C. §1350 ("Alien Tort Claims Act") and 18 U.S.C. §1367.  This Court has both personal and subject-matter jurisdiction over the Defendant herein.

35.     Venue is both proper and convenient in this District pursuant to 28 U.S.C. §1391.


## FACTUAL ALLEGATIONS

### I.     Arab Bank

36.     Arab Bank is the largest bank in Jordan with reported total assets of $23 billion. Based in Amman, Jordan, its common stock is publicly traded on the Amman Stock Exchange. Arab Bank is majority owned and controlled by the shareholders of Arab Bank Group, a Jordanian holding company, which is controlled by the Shoman family, a Jordanian family of Palestinian descent.  Arab Bank and Arab Bank Group constitute a single Jordanian banking institution, and they own, control and/or operate offices and branches worldwide, including branches in every Arab country and 15 branches that are located in Palestinian Authority-administered territories in the West Bank and Gaza.

37.     According to a recent Arab Bank press release, "It is worth mentioning that Arab Bank was established in Palestine in 1930." Indeed, since at least the mid 1990s, Arab Bank has been the preferred channel for the transfer of funds from institutional sources into the Palestinian Authority-administered territories and into the hands of terrorists, their front organizations and their dependents.  For example, Arab Bank has provided banking services to the Islamic Resistance Movement ("Hamas"), named as a Specially Designated Terrorist Entity ("SDT") in

1995, as a designated Foreign Terrorist Organization ("FTO") in 1997 (and subsequently in 1999, 2001, and 2003), and as a Specially Designated Global Terrorist Entity ("SDGT") in 2001, directly through its El-Mazra Branch Account # 3-810-622473-0330 in Beirut, Lebanon, which collected funds directly in the name of Hamas. Similarly, the Hamas web site directed its supporters to make contributions to Account # 38924/510 at Arab Bank's Gaza branch. As described below, Arab Bank also administers the financial infrastructure that supports terrorism by distributing monies to designated families of Palestinian "martyrs", including suicide bombers and those killed, wounded or imprisoned in perpetrating terrorist attacks, and to other terrorist operatives and front organizations.

38.    Advertisements publicized throughout the Middle East call for donations to Arab Bank accounts to help support the intifadah.

39.    On October 3, 2000, during the early days of the ongoing violent Palestinian-Israeli confrontation, the Orbit TV (an Arabic cable TV network backed by the powerful Mawarid Group of Saudi Arabia) ' Ala al-Hawaa' ["On the air"] program interviewed Hezbollah leader Sheikh Hassan Nasrallah and Sheikh Ahmad Yassin, the former Hamas leader who was killed in an Israeli targeted attack on March 22, 2004. The program showed a slide of the names of banks and account numbers where donations could be deposited for the Palestinians participating in the violent confrontation with Israel: Arab Bank, Geneva Branch, account number 2225200; and Arab Bank, Al-Shamissani, Amman, account number 9171.1.510.

40.    The Voice of Al-Aqsa Internet site (www.aqsavoice.net) (which served Hamas) posted an announcement on May 3, 2004, condemning the Israeli air force's attack on the station. The announcement read as follows: "In order to help renew our broadcasts, you can donate to the

Al-Ribat Lil-I'lam account, number 100835 at the Al-Rimal [ Gaza] branch of the Arab Bank or [account] number 20669 at the Arab Islamic Bank in Gaza."

41.     A call was sent out over the Hamas Internet site asking for contributions to the Palestinian publicity effort (the "holy war of words") through the Beirut branch of the Arab Bank. The Hamas Internet site posted the following message on October 9, 2002: "For the blessed victory of Al-Aqsa, and the uprising of the valiant Palestinian people, to expose the Zionist acts of slaughter against the defenseless Palestinian people and to show the Zionist danger to the Arab and Islamic world – contribute to the Palestinian Information Center on the Internet [the Hamas Internet site, www.palestine-info.info] for the honor of participating in the 'holy war of words'…contribute to the support of the site so that it can continue to expand…"

42.     The following appeal from the chairman of the Tulkarem Charitable Society to the Arab Bank director about transferring financial support from the Saudi Commiettee in Support of the intifadah was posted on the Hamas Internet site on July 10, 2004:

> "To save the holy Temple Mount and the intifada [violent insurrection] of the valiant Palestinian people…to reveal the Zionist danger to the Arab and Islamic world… to save Jerusalem and Al-Aqsa, to support the fighters and to publicize their courage and brave resistance… to expose the truth others are trying to hide, ignore and distort…the Palestinian Information Center [the Hamas Internet site], Palestine's voice to the world… [calls upon you to] contribute to the Palestinian Information Center site on the Internet, contribute to support the site, so that it can continue to expand… help us, participate in the truth by supporting Palestinian and Islamic media. The Palestinian Information Center accepts contributions and financial participation. The account is in American dollars."

43.     In addition to operating all over the Middle East, Arab Bank has operated a federally chartered branch in New York since 1983. The bank is supervised by the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency and the FDIC.

44.    Arab Bank has a duty to conduct itself in conformity with high ethical standards, comply with the laws and regulations applicable to the industry, avoid use of the bank's services for illegal purposes, and cooperate fully and appropriately with law enforcement authorities. On these points, in 1988, the Basel Committee[9], an international banking standards organization that formulates broad supervisory standards and guidelines and recommends statements of best banking practice, stated the following principles:

- "Banks' management should ensure that business is conducted in conformity with high ethical standards and that laws and regulations pertaining to financial transactions are adhered to."

- "[B]anks should not set out to offer services or provide active assistance in transactions which they have good reason to suppose are associated with money-laundering activities."

- "Banks should cooperate fully with national law enforcement authorities to the extent permitted by specific local regulations relating to customer confidentiality. Care should be taken to avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading information.

- "Where banks become aware of facts which lead to the reasonable presumption that money held on deposit derives from criminal activity or that transactions entered into are themselves criminal in purpose, appropriate measures, consistent with the law, should be taken, for example, to deny assistance, sever relations with the customer and close or freeze accounts."

*(Basel Committee, Prevention of Criminal Use of the Banking System for the Purpose of Money-Laundering, Statement of Principles (December 1988), reprinted in BSA Manual, Section 1501.0 (September 1997), at 3-4.)*

---

[9]    The Basel Committee was established as the Committee on Banking Regulations and Supervisory Practices by the central-bank Governors of the Group of Ten countries at the end of 1974. The Committee's objective is to improve supervisory understanding and the quality of banking supervision worldwide by, inter alia, setting minimum supervisory standards and guidelines and recommending statements of best practice.

45.      Arab Bank admits that it is "at the forefront of preventing money-laundering and terrorist financing."[10] It admits that, "[a]s a matter of general policy, the Bank deliberately applies the strictest of the rules as set out by the various regulators."[11] It admits, "[m]ost importantly, in order to counter terrorist financing transactions, Arab Bank applies the Office of Foreign Assets Control's list (commonly known as the "OFAC list"), as well as other lists, including local lists developed by the jurisdictions in which the bank operates."[12] In fact, Arab Bank admits that "[i]ndependently of any regulatory requirements, the Bank has been at the forefront of creating and implementing strict standards on its own."[13] As Arab Bank acknowledges that it is at the forefront of terrorist financing regulations and that it has independently created even stricter standards of its own, it is obviously aware of, and contends to be compliant with, all United States federal laws and all international standards that apply to financial institutions.

46.      According to an article in *Al Quds Al Arabi* newspaper on September 7, 2004, Arab Bank issued a statement to the press claiming that "Arab Bank practices the highest professional banking standards in Palestine, New York, or in any of its branches, numbering 420 and operating in 28 countries around the world."

47.      In a recent statement by the Jordanian Banking Association discussed in a December 30, 2004, article in *Al Sharq Al Awsat* Newspaper, the Association noted that: "the

---

[10]      Declaration of Shukry Bishara, filed in support of Defendants' Memorandum of Law in Support of its Motion to Dismiss the First Amended Complaint, <u>Linde, et al. v. Arab Bank</u>, Civ. Action No. 04 CV 2799 (NG)(ASC) (EDNY), at ¶ 44, [hereinafter "Bishara Decl."].

[11]      Id. at ¶ 45.

[12]      Defendants' Memorandum of Law in Support of its Motion to Dismiss the First Amended Complaint, Linde, et al. v. Arab Bank, Civ Action No. 04 CV 2799 (NG)(ASC) (EDNY), at 5.

[13]      Bishara Declaration at ¶ 50.

Arab Bank...operates within the framework of the regulations and the supervision of the Central Jordanian Bank and the central banks in the countries where it operates, including the American Federal Reserve Bank."

48.    Despite those assertions, Arab Bank maintained accounts for terrorists and supporters of extremist organizations such as Hamas and Al Qaeda, including Yassin Al Qadi, Waleed Abu Shaikah, Adel Al Harithy, Omar Saleh Saeed Al Amoudi, and Cambridge Engineering Systems.  In addition, Arab Bank maintained the following accounts:

- Account no. 544134, belonging to Muhammad Nazih Salah Abu 'Abah (Hamas operative from Qalqiliya);

- Account no. 582310, belonging to Muntasser Abu Ghalyon (head of Fatah/Tanzim in Jenin);

- Account no. 431387, belonging to Na'if Abu Sharakh (head of Fatah/Tanzim in Nablus);

- Account no. 579639, belonging to Ibrahim Mustafa Ibrahim Abu Shaduf of Jenin (father of suicide bomber member of the Palestinian Islamic Jihad); and

- Account no. 36972, belonging to Tahaani Muhammad Mahmoud Manameh from the Gaza Strip (the wife of a senior Hamas operative who was killed in May 2001).

49.    The United States Government has alleged that the Treasurer of PIJ, Mohammed Tasir Hassan Al-Khatib, held a bank account at the Riad Al Sulh Branch of the Arab Bank in Beirut, Lebanon.

50.    Operatives of PIJ within the United States wire-transferred $102,872.00 to the Arab Bank account of the PIJ Treasurer on February 7, 1994. *See United States v. Sami Amin Al-Arian, et al.*, Case No. 8:03-CR-77-T-30TBM (M.D. Fla.), Superseding Indictment (Dkt. #636, Sept. 21, 2004), at 33.

51.     Sheikh Yusuf Al-Qaradawi, a leading Islamic cleric in the Middle East whose *fatwas*, or religious edicts, have been adopted by Hamas and PIJ among others, has issued *fatwas* sanctioning the use of suicide bombings both by men and women against the people of Israel as a permissible activity in Islam.  Qaradawi has stated, "These operations [suicide bombings] are among the most respectable forms of Jihad.  This legitimate terror is allowed by the Qur'an."

52.     In addition to issuing *fatwas* sanctioning the use of suicide bombings in a campaign of terrorism against the people of Israel, Qaradawi helped found and currently heads an organization known as the Coalition of Benevolence [in Arabic, "I'talaf Al-Khair"].  This organization is comprised of a number of charities throughout the world that have been implicated specifically with Hamas including, among others, the Palestinian Relief and Development Fund – Interpal in the United Kingdom (which has been designated as a Specially Designated Global Terrorist Entity by the United States based on its relationship with Hamas), the Comitè de Bienfaisance et de Secours aux Palestinien ("CBSP") in France, the Al-Aqsa Foundation in Germany, the Netherlands, and Belgium, and Al-Quds Fund for Humanitarian Services in Canada.  The Coalition of Benevolence is a product of the 101 Days Campaign initiated by a number of Hamas front organizations in the Middle East, Europe, and North America.

53.     A Hamas-affiliated website has called for donations to "Al-Aqsa and the brothers in Palestine" through organizations around the world including Interpal, Al-Aqsa Foundation, and CBSP – all members of Qaradawi's coalition.  The website also requested donations to be deposited in the account of the "101 days organization" at the Arab Bank's branch in Lebanon. Furthermore, the 101 Days Campaign published a request on its official website that visitors to

its website donate to the organization through its accounts in any branch of the Arab Bank. As stated in French publications in July 2003, the CBSP also holds an account in the Arab Bank.

54.     Furthermore, members of the coalition have transferred money to the accounts held by the Humanitarian Relief Association (the "HRA") in the West Bank branch of the Arab Bank. The HRA, a charitable organization registered and located in Israel, was formed by the Islamic Movement in Israel. Both the HRA and the leaders of the Islamic Movement have been indicted in Israel and are accused of conspiring "to aid and hold funds for an unlawful organization" – Hamas. The Supreme Court of the State of Israel has affirmed that the HRA's activities with the Arab Bank encouraged the creation of a home front for the support of terrorist attacks, including suicide bombings and other murderous attacks, perpetrated by Hamas.

55.     In addition, Arab Bank maintained accounts for organizations affiliated with terrorist organizations including, but not limited to:

| Branch | Account No. | Name on Account | Associated Terrorist Organization |
|---|---|---|---|
| Jenin | 581345 | Jenin Charitable Society | Hamas |
| Nablus | 400271 | Nablus Al-Tadamun Charitable Society | Hamas |
| Nablus | 400336 | Nablus Islamic Aid Committee | Hamas |
| Qalqiliya | 542042 | Al-Qur'an wa al-Sunnah Society Qalqiliya | Hamas |
| Tulkarem | 500010 | Tulkarem Charitable Society | Hamas |
| Tulkarem | 503375 | Tulkarem Charitable Society | Hamas |
| Nablus | 445444 | Al-Lod Charitable Society | Hamas |
| Nablus | 400415 | Social Center, Rehabilitation Committee, Al-Wafaa' Building Charitable Society | Hamas |
| Qalqiliya | 540939 | Qalqiliya Charitable Society | Hamas |
| Nablus | 400739 | Tubas Charitable Society | Hamas |
| Ramallah | 666473 | Jama'ah al-Islamiya | Hamas |
| Al-Manara-Qalqiliya | 610686 | Ramallah Charitable Society | Hamas |
| Al-Bireh | 649611 | Al-Bireh Al-Islah Society | Hamas |
| Bethlehem | 717520 | Bethlehem Elehssan Society | Hamas |
| Bethlehem | 709966 | Bethlehem Society for Orphans | Palestinian Islamic Jihad |

| Hebron | 760376 | Hebron Young Muslims' Society | Hamas |
|--------|--------|-------------------------------|-------|
| Hebron | 750049 | Hebron Young Muslims' Society | Hamas |
| Hebron | 751100 | Hebron Young Muslims' Society | Hamas |
| Bethlehem | 713392 | Zakat Committee Dehaishe Refugee Camp | Hamas |
| Hebron | 751542 | Hebron Elehssan Society | Hamas |
| Bethlehem | 711161 | Al-Islah Charitable Society | Hamas |
| Al-Bireh | 609509 | Al-Huda Society – Ramallah | Hamas |
| Gaza | 124109 | Central Islamic Society – Gaza Strip | Hamas |
| Ramal | 100208 | Charitable and Children's Mercy Society – Gaza Strip | Hamas |
| Gaza | 10188 | House of the Qur'an and Sunnah Society | Hamas |
| Ramal | 100605 | Trusteeship for the Care of the Aged Society | Hamas |
| Ramal | 100541 | Al-Ansar Society | Identified with Iran |
| Ramal | 120655 | Al-Ansar Society | Identified with Iran |
| Gaza | 3683 | The Islamic Society | Hamas |
| Gaza | 365459 | The Al-Nur Prisoner Society | Hamas |
| Khan Yunis | 2001438 | Khan Yunis Charity and Mercy Society | Hamas |
| Gaza | 5858 | Nusseirat Islamic Society | Hamas |
| Gaza | 150/3 | Khan Yunis Charitable Society | Hamas |
| Gaza | 35287 | Gaza Charitable Society for the Sick | Hamas |
| Gaza | 3155 | The Islamic University – Gaza | Hamas |
| Khan Yunis | 200139 | Qararah Islamic Society | Hamas |
| Gaza | 15115 | Jabalia Islamic Society | Hamas |
| Rafah | 2036 | Rafah Islamic Society | Hamas |
| Azariya | 302656 | Azariya Society for the Fostering of Women | Hamas |
| Gaza | 39435 | Nur Al-Ma'rifah Society | Hamas |
| Jenin | 578669 | Jenin Elehssan Society | Palestinian Islamic Jihad |

56.    The website of Al-Ansar (a designated Hamas charity front) helpfully explains

that:

> The Director General of the Al-Ansar Charitable Society and the person in charge of the portfolio for the care of the martyrs at the Society's website said that the Society has furnished the management of the Arab Bank with lists of names of the martyrs and the families of the entitled beneficiaries, in order to pay the monies to which the martyrs are entitled.

Al-Ansar maintains an account with the Arab Bank in Gaza. Arab Bank provides financial services to agents of Hamas by maintaining bank accounts for the following Specially Designated Global Terrorist Entities affiliated with Hamas:

(1)     The Association de Secours Palestinien (ASP) —Arab Bank, Zurich

(2)     Commite de Bienfaisance et de Secours aux Palestiniens (CBSP) — Arab Bank, Paris

(3)     Palestinian Association in Austria — Arab Bank, Paris

57.     Defendant Arab Bank has also knowingly laundered funds for the Holy Land Foundation for Relief and Development ("HLF"), a Texas based "charity" which has raised funds in the United States for Hamas for more than a decade. Arab Bank, in turn, channeled tens of thousands of dollars for HLF through its New York branch to the Ramallah Charitable Committee, the Tulkarem Charity Committee and the Charitable Society of Hebron, all agents of Hamas.

58.     On March 15, 1996, a feature article in *The New York Times* detailed the financing of Hamas by so-called charitable organizations. The article specifically discussed Israeli government claims that HLF was a "key fundraising operation" for Hamas.

59.     On May 6, 1997, the government of Israel designated HLF as a Hamas front organization and declared that HLF "deals in the practice of transferring monies to families of Hamas activists, who carried out deadly attacks ...."

60.     Arab Bank nonetheless claims to have a "highly professional relationship" with Israeli authorities.

61.     On September 25, 1997, the Palestinian Authority closed what it identified as 16 Hamas institutions and associations. HLF's Gaza office was one of the entities (temporarily)

closed by the Palestinian Authority. The closure, including identification of HLF as a targeted Hamas entity, was detailed in a *Jerusalem Post* news account on September 28, 1997.

62.    HLF and its officers have been criminally indicted in the United States District Court for the Northern District of Texas for providing material support to a designated Foreign Terrorist Organization (Hamas) — including for specific transactions involving payments made by HLF to the Ramallah Charitable Committee, Tulkarem Charitable Committee, and the Islamic Charity Society of Hebron.

63.    The indictment specifies particular financial transactions initiated by HLF which resulted in monetary transfers to the Ramallah Charitable Committee, Tulkarem Charitable Committee, and the Islamic Charity Society of Hebron which violate 18 U.S.C. §2339B.

64.    On January 10, 2001 a federal district court in Illinois rendered a decision declining to grant a motion to dismiss in a case initiated by the parents of David Boim, who was killed by a Hamas terrorist in 1997. The Boims had sued, among others, HLF, for providing material support to Hamas, a designated Foreign Terrorist Organization.

65.    Nonetheless, Arab Bank continued to deposit HLF fund transfers and credit the Arab Bank account of the Ramallah charitable front even after the *Boim* case placed the defendant on further notice of HLF's criminal activities.

66.    Similarly, the New York branch of the Arab Bank has facilitated the transfer of significant sums to the Tulkarem Charitable Committee and other agents of Hamas despite the fact that in some cases both the "donor" of the funds as well as the recipient had been previously formally designated as "Unlawful Organizations" by the government of Israel.[14]

---

[14] One of the signatories on the Tulkarem Charitable Committee account is Ammar Tawfiq Ahmad Badawi, a prominent member of the Muslim Scholars Association who was a signatory on the infamous *Fatwa* — or Islamic religious ruling — declaring that suicide bombings are permitted by Islamic law. Mr. Badawi is a leading figure in Hamas.

67.     Moreover, following the Israeli army's military operations in the spring of 2002, the government of Israel obtained and subsequently disclosed extensive materials (most of them available on the internet) demonstrating the Tulkarem Charitable Committee's connections to Hamas and the Islamist movement.

68.     Nonetheless, Arab Bank and its New York branch continue to convert substantial sums of money and forward tens of thousands of dollars from New York to the Tulkarem account of the Tulkarem Charitable Committee at the Arab Bank and to other known Hamas fronts.

69.     The charitable front organizations play a central role in financing the terror campaign by providing the means of raising funds to maintain the institutions that serve as recruiting grounds for terrorist organizations.

70.     As set forth in an internal Hamas memorandum recently captured by the Israeli army during a raid of the offices of the Hebron Charitable Committee, Hamas has arranged for the "transfer [of] large sums" to the charitable committee and other Hamas front organizations through the "charity activities" of their operatives abroad.

71.     The memorandum emphasizes that Hamas "require[s] new bank account numbers for money transfers" and promises that the Hamas will:

> invest efforts to transfer money for the martyrs (the shahids) and prisoners, via the transfer [to] charitable institutions. This is a primary goal in the framework of the effort to transfer aid money to these institutions, so that these budgets are released in the best manner and in order to bring about an improvement in the level of the movement's performance.

72.     The memorandum concludes with the promise that Hamas will continue to "build up the activities and operations" of its front organizations by, among other things,

*"taking advantage of the conditions and the atmosphere of death.*"

73.     The financial support provided by the Saudi Committee via the Arab Bank as well as the accounts maintained by the terror organizations' charitable fronts constitutes the backbone of the donor base and operational budgets of Hamas and the PIJ, and has allowed them to expand their operations, attract more recruits, and professionalize their financial distribution channels.

74.     Each of these front organizations officially holds itself out to the public as a charitable organization with a purely humanitarian and benign purpose. In fact, however, the primary mission of these organizations is to raise and launder funds for terrorist organizations and otherwise to coordinate and conduct activities that are essential to the conduct of terrorist operations and to the material support of terrorist operations.

75.     Funds raised by the charitable front organizations are fungible and are allocated in part to terrorist activities or used to free up other funds that are then allocated for terrorist activities.

76.     In addition to the Saudi Committee's plan, contributions from individual and corporate sponsors abroad are primarily made to the charitable front organizations. The front organizations make those contributions available to Hamas and the PIJ in accordance with the instruction of their leaders. These organizations then disburse a percentage of the funds they receive from their front organizations to purchase weapons and explosive materials, to recruit and train operatives and otherwise to plan and carry out terrorist attacks.

## II.    Standards Applicable To Financial Institutions, Including Arab Bank

77.     The statutory and regulatory duties incumbent upon financial institutions operating in the United States are set out in the Bank Secrecy Act ("BSA")[15] and the regulations

---

[15]     Titles I and II of Public Law 91-508, Oct. 26, 1970, as amended, codified at 12 U.S.C. 1829b, 12 U.S.C. 1951-1959, and 31 U.S.C. 5311 et seq; Money Laundering Control Act (1986), 18 U.S.C. 1956; The Money

appertaining thereto. Other applicable industry standards support and clarify the duties of financial institutions.

78.     The BSA and the BSA regulations that the Department of Treasury ("Treasury") has issued apply to all financial institutions and specifically apply to banks. A principle purpose of the BSA is to require financial institutions to maintain appropriate records and file certain reports which are particularly useful in investigating and uncovering money laundering, drug activities, terrorism and other illegal activities.

79.     The BSA requires financial institutions operating in the United States, and their directors, to undertake a number of anti-money laundering ("AML") efforts to ensure that financial institutions do not become conduits for terrorist financing or criminal proceeds, or facilitators of money laundering. Key provisions require financial institutions and their directors to establish AML programs that include explicit written policies and procedures which are approved by the banks directors with a notation of such approval in the minutes of the directors' meetings, to designate a qualified bank employee as the BSA compliance officer with day-to-day responsibility for all aspects of the compliance program, to train employees, to establish an internal audit function, to verify the identity of persons seeking to open and maintain accounts (often termed "Know Your Customer" requirements), and to file reports identifying suspicious activities and currency transactions greater than US$10,000 to guard against money laundering.

80.     In addition to the BSA requiring financial institutions to implement AML procedures, international standards applicable to the financial services industry would similarly require implementation and enforcement of AML procedures. To the extent that the United

---

Laundering Prosecution Improvements Act, 31 U.S.C. 5312, 5321; The Annunzio-Wylie Anti-Money Laundering Act (1992) (Pub.L. 102-550, Title XV, Oct. 28, 1992, 106 Stat. 4044), 31 U.S.C. 5318(h); The Money Laundering and Financial Crimes Strategy Act (1998), 31 U.S.C. 5341(b) and 5342(b).

States has accepted membership or agreed to implement standards or principles of any organization promulgating such standards or principles, the standards or principles are requirements for financial institutions to conduct business in the United States.

81.    One example of such international standards comes from the Financial Action Task Force ("FATF"). The FATF is an intergovernmental body originally established by the 1989 Paris G-7 Summit to develop and promote standards and policies to combat money-laundering. The FATF includes 31 countries and two international organizations, including the major financial center countries of Europe, North America and Asia.

82.    In April 1990, and updated in 1996 and 2003, the FATF issued a set of Forty Recommendations that established a minimum for international AML standards and that has been endorsed by more than 130 countries. In October 2001, the FATF dealt specifically with terrorist financing by establishing a set of Eight Special Recommendations on Terrorist Financing, complementary to the Forty Recommendations. In particular, SR IV recommends that banks that "suspect or have reasonable grounds to suspect that funds are linked or related to, or are to be used for terrorism, terrorist acts or by terrorist organisations," are required to report their suspicions to the proper authorities. The FATF Forty and the Eight Special Recommendations have been recognized by the International Monetary Fund and the World Bank as the international standards for combating money laundering and the financing of terrorism.

83.    Among the FATF's 40 Recommendations regarding AML laws is Recommendation 15, recommending the following:

> 15. Financial institutions should develop programmes against money laundering and terrorist financing. These programmes should include:

(a) the development of internal policies, procedures and controls, including appropriate compliance management arrangements, and adequate screening procedures to ensure high standards when hiring employees;

(b) an ongoing employee training programme….

84.     Financial institutions must ensure that appropriate bank personnel are trained in all aspects of the regulatory requirements of the BSA and the banks internal BSA compliance and AML policies and procedures. According to the *Bank Secrecy Act/Anti-Money Laundering Comptroller's Handbook, September 2000, at 6-7,* an effective training program includes provisions to ensure that:

- All bank personnel, including senior management, who have contact with customers (whether in person or by phone), who see customer transaction activity, or who handle cash in any way, receive appropriate training. Those employees include persons involved with branch administration; customer service; lending; private, or personal banking; correspondent banking (international and domestic); trust; discount brokerage; funds transfers; safe deposit/custody; and vault activities.

- Training is ongoing and incorporates current developments and changes to the BSA, anti-money laundering laws, and OCC and FinCEN regulations. New and different money laundering schemes involving customers and financial institutions should be addressed. It also should include examples of money laundering schemes and cases, tailored to the audience, and in ways in which such activities can be detected or resolved.

- Training focuses on the consequences of an employee's failure to comply with established policy and procedures (e.g., fines or termination). Programs should provide personnel with guidance and direction in terms of banking policies and available resources.

85.     **"Know Your Customer" standards must be met**. At all relevant times, the standard within the financial institution industry has been to have "Know Your Customer" practices to insure the immediate detection and identification of suspicious activity. *(BSA Manual Section 601.0 (September 1997), at 1.)* In a 1988 Statement of Principles, the Basel Committee stated the following principle regarding the "Know Your Customer" policy:

"With a view to ensuring that the financial system is not used as a channel for criminal funds, banks should make reasonable efforts to determine the true identity for all customers requesting the institution's services."

*(Basel Committee, Prevention of Criminal Use of the Banking System for the Purpose of Money-Laundering, Statement of Principles (December 1988), reprinted in BSA Manual, Section 1501.0 (September 1997), at 3.)*

86.     In addition to identifying a customer, an integral part of an effective

"Know Your Customer" policy is a comprehensive knowledge of the transactions carried out by

the customers of the financial institution. Therefore, the "Know Your Customer" procedures

established by the institution must allow for the collection of sufficient information to develop a

"customer profile."    The primary objective of such procedures is to enable the financial

institution to predict with relative certainty the types of transactions in which a customer is likely

to be engaged. The profile should allow the financial institution to understand all facets of the

customer's intended relationship with the institution, and, realistically, determine when

transactions are suspicious or potentially illegal. *(BSA Manual Section 601.0 (September 1997),*

*at 2.)*

87.     **Due Diligence is necessary when opening and maintaining accounts.**

According to the Wolfsberg AML principles[16], global anti-money laundering standards and

guidelines established by the world's largest banks, a "bank will endeavor to accept only those

clients whose source of wealth and funds can be reasonably established to be legitimate... Mere

---

[16]     The Wolfsberg Group is an association of large global banks that came together in 2000, at the Château Wolfsberg in north-eastern Switzerland, which agreed to a set of global anti-money-laundering guidelines for international private banks.  The banks initially involved included ABN AMRO Bank, Barclays Bank, Banco Santander Central Hispano,S.A., The Chase Manhattan Private Bank, Citibank, N.A., Credit Suisse Group, Deutsche Bank AG, HSBC, J.P. Morgan, Société Générale, and UBS AG.  The Group's purpose is to develop financial services industry standards for Know Your Customer, Anti-Money Laundering and Counter Terrorist Financing policies.  The Wolfsberg Anti-Money Laundering Principles for Private Banking were published in October 2000 (and revised in May 2002). In January 2002, the Group published a Statement on the Financing of Terrorism and, in November 2002, released the Wolfsberg Anti-Money Laundering Principles for Correspondent Banking. The Wolfsberg Group's most recent Statement, on Monitoring Screening and Searching, was published in September 2003. The standards are widely known.

fulfillment of internal review procedures does not relieve the private banker of this basic responsibility."

88.    The Wolfsberg AML principles require that, for all accounts, the bank must exercise the following due diligence principles to identify the principle beneficial owners of an account:

- Natural persons: when the account is in the name of an individual, the private banker must establish whether the client is acting on his/her own behalf. If doubt exists, the bank will establish the capacity in which and on whose behalf the account holder is acting.

- Legal entities: where the client is a company, such as a private investment company, the private banker will understand the structure of the company sufficiently to determine the provider of funds, principal owner(s) of the shares and those who have control over the funds, e.g. the directors and those with the power to give direction to the directors of the company. With regard to other shareholders the private banker will make a reasonable judgment as to the need for further due diligence.

- Unincorporated associations:    the above principles apply to unincorporated associations.

89.    To meet the due diligence standards established by the Wolfsberg AML principles, banks should meet the client before opening the account and must collect and record the following information about each account:  Purpose and reasons for opening the account; Anticipated account activity; Source of wealth (description of the economic activity which has generated the net worth); Estimated net worth; Source of funds (description of the origin and the means of transfer for monies that are accepted for the account opening); and References or other sources to corroborate reputation information where available.

90.    The FATF warns that mere financial accounting and auditing might be insufficient protection against the abuse.  "Direct field audits of programmes may be, in some instances, the only method for detecting misdirection of funds.  Examination of field operations is clearly a superior mechanism for discovering malfeasance of all kinds, including diversion of

funds to terrorists." FATF Task Force on Money Laundering, Combating the Abuse of Non-Profit Organisations," at ¶ 11, p. 3 (October 11, 2002).

91.    Non-profit Organizations, particularly those held out as charitable organizations, constitute high-risk accounts warranting enhanced due diligence and scrutiny, because the mechanism of charitable fundraising has, "in numerous instances ... been used to provide a cover for the financing of terror." FATF on Money Laundering, "Combating the Abuse of Non-Profit Organisations: International Best Practices," at ¶ 4, p. 1 (October 11, 2002).

92.    Although "[j]urisdictions may differ on the scope of purposes and activities that are within the definition of 'charity,' ... all should agree that ['charity'] does not include activities that directly or indirectly support terrorism, including actions that could serve to induce or compensate for participation in terrorist acts." FATF, "Combating the Abuse of Non-Profit Organisations: International Best Practices," at ¶ 5, p. 2 (October 11, 2002).

93.    The misuse of non-profit organizations for the financing of terrorism has been a crucial weak point in the global struggle to stop such funding at its source. This issue has captured the attention of the Financial Action Task Force (FATF), the G7, and the United Nations, as well as national authorities in many regions.  FATF on Money Laundering, "Combating the Abuse of Non-Profit Organisations: International Best Practices," at ¶ 1, p. 1 (October 11, 2002).

94.    The FATF recognizes that the importance of requiring charitable fund-raising and transfer of funds to go through formal or registered channels underscores the benefit of enlisting the established powers of the bank regulatory system – suspicious activity reporting, know-your-customer (KYC) rules, etc – in the fight against terrorist abuse or exploitation of non-profit

organisations. FATF on Money Laundering, "Combating the Abuse of Non-Profit Organisations: International Best Practices," at ¶ 21, p. 5 (October 11, 2002).

95.     Recommendation VIII of the FATF Special Recommendations on Terrorist Financing provides:

> Countries should review the adequacy of laws and regulations that relate to entities that can be abused for the financing of terrorism. Non-profit organisations are particularly vulnerable, and countries should ensure that they cannot be misused:
>
> (i) by terrorist organisations posing as legitimate entities;
>
> (ii) to exploit legitimate entities as conduits for terrorist financing, including for the purpose of escaping asset freezing measures; and
>
> (iii) to conceal or obscure the clandestine diversion of funds intended for legitimate purposes to terrorist organisations.

96.     Offering guidance regarding the process of determining when increased scrutiny is necessary, the Financial Action Task Force has recommended the following in its Guidance for Financial Institutions in Detecting Terrorist Financing:

> Determining when increased scrutiny is necessary?
>
> 7. Financial institutions are encouraged to develop practices and procedures that will help to detect and deter those transactions that may involve funds used in terrorist financing. The increased scrutiny that may be warranted for some transactions should be seen as a further application of the institution's due diligence and anti-money laundering policies and procedures and should lead, when appropriate, to reporting of such financial activity as suspicious or unusual under applicable transaction reporting regimes for a particular jurisdiction.
> …
> [Financial institutions] should ascertain whether transactions are unusual, suspicious or otherwise indicative of criminal or terrorist activity.
>
> *[FATF Guidance for Financial Institutions in Detecting Terrorist Financing, at 2-3.]*

97.     The FATF cautions that the methods terrorists use to secure funds are generally the same as other criminals engaged in money-laundering schemes:

Laundering of terrorist related funds

353.1 and 351.3 (FDIC) and 12 CFR § 563.180 (OTS) and Currency Transaction Reports (IRS Form 4789), pursuant to 31 CFR § 103.22.

100.    Banks must have a written policy on the identification of and follow-up on unusual or suspicious activities. Some examples of unusual or suspicious activities may include:

- Account transactions or other activities which are not consistent with the customer's business or the account's due diligence file;

- Cash transactions over a certain amount;

- Account transactions or other activities that seek to avoid reporting or record keeping requirements;

- Wire, pass-through, and in-and-out transactions

101.    Following the September 11th attacks far greater terrorist financing legislation was enacted. As President Bush stated "[w]e put the world's financial institutions on notice: if you do business with terrorists, if you support them or sponsor them, you will not do business in the United States of America."[17]

102.    Arab Bank, acting in accordance with these banking regulations knew that accounts opened within its branches were being used to fund suicide bombing attacks in Israel sponsored and facilitated by Hamas, PIJ, AAMB, and PFLP who, in turn, engaged in suicide bombings and other murderous attacks in Israel. Moreover, as is discussed in greater detail below, Arab Bank engaged in correspondence with known members of Hamas wherein the bank was instructed to send payments to the families of suicide bombers. Arab Bank Board members and officials publicly called for donations and contributions to the Palestinian Intifada knowing that some portions of those funds would be used to encourage, support, and facilitate suicide bombing and other murderous attacks.

---

[17]    Remarks of President George W. Bush in his address to the Financial Crime Enforcement Network in Vienna, Va., Nov. 7, 2001.

103.    On February 24, 2005, the Office of the Comptroller of Currency (OCC) after beginning its investigation of the practices of Arab Bank's New York office entered into a Consent Order with the bank after it identified deficiencies in the Branch's internal controls, particularly in the area of Bank Secrecy Act and Anti-Money Laundering compliance.

## III.    Historical Background

### Origins of Palestinian Terror

104.    Almost since the formation of the State of Israel in 1948, Palestinian paramilitary and terrorist organizations have sought to destroy it, through, inter alia, the systematic murder of Jews and other civilians in Israel.  In December 1987, a collective Palestinian popular uprising -- or *intifada* -- erupted against Israel in the West Bank and in Gaza.  The *intifada* developed into a well-organized rebellion orchestrated by the Palestinian Liberation Organization ("PLO") from its headquarters in Tunis.  A second Palestinian *intifada*, which erupted in late September 2000, engulfed Palestinians and Israelis in violent armed conflict that continues to this day.   It is popularly called the Al Aqsa Intifada or the Intifada Al Quds.

105.    Each *intifada* was characterized by systematic and widespread terror campaigns designed not only to kill Jews and Israelis, but to intimidate and coerce the civilian population of Israel, to cause Israel to cede territory to the Palestinians and ultimately, to destroy the Jewish state.

106.    With the outbreak of the second *intifada*, Hamas and other Palestinian terrorist organizations – notably PIJ, AAMB, and PFLP – intensified the terror campaign of widespread and systematic suicide bombings and other murderous attacks within Israel, the West Bank and Gaza.

107.   Like Hamas, PIJ, AAMB, and PFLP are similarly committed to the destruction of the State of Israel. According to some estimates, attempted attacks have numbered approximately 21,000 and have targeted Jews, other civilians and those in innocent proximity, resulting in the death and injury of thousands of individuals, an overwhelming majority of which are civilians.

108.   Hamas, PIJ, AAMB, and PFLP rewarded these suicide bombings and other murderous attacks and provided incentives for future acts by financially subsidizing family members of suicide bombers and other terrorist operatives who were killed, injured and imprisoned, and by ensuring that the families of such "martyrs" were revered in the community.

109.   Palestinians terrorist organizations have long used the financial support of "martyrs", including suicide bombers, as a key inducement to terror.  Ibrahim al-Yazuri, an original participant in the founding of Hamas, explained in a London newspaper interview: "The Hamas movement is concerned about its individuals and its elements, especially those who engage in the blessed *jihad* against the hateful Israeli occupation…. The movement takes care of their families and their children and provides them with as much material and moral support as it can…. The movement provides this aid through the support and assistance it gives to *zakat* committees and the Islamic associations and institutions in the Gaza Strip."  According to the late Hamas leader Sheikh Ahmed Yassin, Hamas, as of 2001, distributed $2 to $3 million each month to relatives of Palestinian suicide bombers.

**Hamas**

110.   Harakat al-Muqawamah al-Islamiyya is Arabic for "The Islamic Resistance Movement" and is known by its acronym of Hamas.  Hamas is a terrorist organization based in

the West Bank and Gaza Strip that is well-known throughout the World. It has been targeted as an institution of terror and consequent genocidal conduct since the early 1990's.

111. Hamas was founded by Sheikh Ahmed Yassin in 1987. In August 1988, Hamas published its charter called the Covenant of the Islamic Resistance Movement which states that the purpose of Hamas is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel and its citizenry and innocent bystanders through *violent jihad*. This charter was distributed throughout the Occupied Territories, Jordan, the Middle East and throughout the World first in booklet form and, with the advent of the Internet, *via* this medium.

112. The charter states that "Israel will exist and will continue to exist until Islam will obliterate it, just as it obliterated others before it." The charter sets forth Hamas' slogan:

> "Allah is its target, the Prophet is its model, the Koran its constitution: *Jihad is its path and death for the sake of Allah is the loftiest of its wishes*."

113. Hamas condemns all peaceful solutions to the Palestinian Israeli conflict. "Initiatives and so-called peaceful solutions and international conferences, are in contradiction to the principles of the Islamic Resistance Movement....There is no solution for the Palestinian question except through Jihad. Initiatives, proposals and international conferences are all a waste of time and vain endeavors."

114. Hamas achieves its goals through a military and a social wing. The military wing, called Izz el-Din al-Qassam Brigades, carries out suicide bombings and other murderous attacks within Israel, the West Bank and Gaza. These attacks target civilians and have resulted in deaths and injuries to hundreds of individuals including Plaintiffs in this action who number in excess of 600 individuals as of this filing. The number of those killed or maimed or injured since September of 2000 is estimated to exceed 20,000.

119.    The ideological affect on young children cannot be overstated.  It has been widely reported that Hamas recruits children to conduct suicide bombing attacks.

120.    An August 13, 2001 *USA Today* article describes how Hamas' social infrastructure, in this case Hamas-run schools, serve Hamas' ends:

> In Hamas-run kindergartens, signs on the walls read:  "The children of the kindergarten are the shaheeds (holy martyrs) of tomorrow."  The classroom signs at Al-Najah University in the West Bank and at Gaza's Islamic University say, "Israel has nuclear bombs, we have human bombs."  At an Islamic school in Gaza City run by Hamas, 11-year-old Palestinian student Ahmed states, "I will make my body a bomb that will blast the flesh of Zionists, the sons of pigs and monkeys . . . I will tear their bodies into little pieces and cause them more pain than they will ever know."  "Allah Akbar," his classmates shout in response:  "God is great."  "May the virgins give you pleasure," his teacher yells, referring to one of the rewards awaiting martyrs in paradise.  Even the principal smiles and nods his approval.  "You don't start educating a shaheed at age 22," says Roni Shaked, a terrorism expert and former officer in Israel's Shin Bet secret service.  "You start at kindergarten so by the time he's 22, he's looking for an opportunity to sacrifice his life."

121.    In 1995, the U.S. government named Hamas a "Specially Designated Terrorist" entity, at which time its assets subject to U.S. jurisdiction were blocked by Executive Order 12947 and implementing regulations.  The Executive Order prohibits transactions, including financial transactions, with organizations and individuals so designated.  This designation was well-known by Arab Bank and by all financial institutions.  Former Hamas Political Bureau Chief and current Deputy Chief Mousa Abu Marzook was designated as a Specifically Designated Terrorist on August 29, 1995.

122.    On October 8, 1997, Hamas was designated a Foreign Terrorist Organization by the U.S. Secretary of State pursuant to 8 U.S.C. § 1189, by publication in the Federal Register.  It became unlawful to provide material support and resources, including currency or monetary instruments, financial services, personnel, transportation and other provisions, to any component of Hamas.

123.    The designation of Hamas was a public event well-known to the entire banking community including Arab Bank.  On October 12, 1997, the Jordanian newspaper *Al-Ra'y* listed the designation of Hamas as a foreign terrorist organization.

124.    Arab Bank provided financial services and direct financial contributions to Hamas knowing that Hamas was listed in as a Specially Designated Terrorist entity in 1995, as a designated Foreign Terrorist Organization in 1997, and as a Specially Designated Global Terrorist Entity in 2001.

**Palestinian Islamic Jihad**

125.    The Palestinian Islamic Jihad –Shiqaqi Faction ("PIJ") is an international terrorist organization with "cells" or units located throughout the world.  PIJ is also known as "the Islamic Movement in Palestine," "The Movement," and "The Family."

126.    PIJ published a document describing its organizational structure, goals and principles entitled "Manifesto of the Islamic Jihad in Palestine."  The PIJ Manifesto is widely distributed throughout the Occupied Territories, Jordan, the Middle East and the entire world.

127.    The Manifesto states that: "The Islamic Jihad Movement in Palestine is a revolutionary 'Jihad' movement embracing Islam as Religion and State (Form of Government). It is the vanguard of the Islamic Revolutionary Movement.  The guiding principle or characteristic is that "Jihad is the solution to liberate Palestine and topple the infidel regimes."

128.    PIJ, like Hamas, states as its political constant "the rejection of any peaceful solution for the Palestinian Cause, and the affirmation of the Jihad Solution and the Martyrdom style as the only choices for liberation."  PIJ's general goals include the "realization of the Islamic unity through Collective Jihad [and] the liberation of the Holy Land from the Zionist occupation."

129.    PIJ's Manifesto lists specific means by which it plans to obtain its general goals which include:

- "triggering a continual attrition of the abilities and capacities of the enemy, and striking its economical and financial sources."

- "The creation of a situation of terror, instability and panic in the souls (minds) of Zionists and especially the groups of settlers, and force them to leave their houses."

- "The creation of a psychological barrier between the Jews and the Muslim Palestinian people; and the implementation of a conviction that the coexistence is impossible; and resisting the heralds of the idea of coexistence between Arabs and Israelis."

- "coexistence is impossible; and resisting the heralds of the idea of coexistence between Arabs and Israelis."

130.    PIJ even published slogans, such as the following, to entice people to engage in suicide bombings and other murderous attacks:

- Jihad is the way to liberation.

- Jihad is the way to Unity and Union is the way to consolidation.

- Martyrdom awards life.

- The Muslim Populations are the dimension of the Intifada.

- Blood is the dower for Freedom.

- Victory or Martyrdom, the way for Jihad.

131.    PIJ also has established Committees including: a Cultural Committee to publish leaflets, booklets and prepare videotapes and audiotapes to spread the message of the Movement; a Financial Committee to collect financial contributions, invest those contributions, and distribute the contributions to "different fields of action;" a Public Relations Committee to be the spokesmen of the Movement and to spread PIJ's message; the Committee for Prisoners and Martyrs to spread money received from abroad to the families of "martyrs" and prisoners.

141

132.    In January 1995, PIJ was listed as a Specially Designated Terrorist Entity ("SDT") by the U.S. Department of Treasury pursuant to Executive Order 12947 prohibiting transactions with groups that threaten to disrupt the Middle East peace process.

133.    On October 8, 1997, PIJ was designated a Foreign Terrorist Organization by the U.S. Secretary of State pursuant to 8 U.S.C. §1189, by publication in the Federal Register.    It became unlawful to provide material support and resources, to include currency or monetary instruments, financial services, personnel, transportation and other provisions, to any component of PIJ.

134.    The designation of PIJ was a public event well-known to the entire banking community including Arab Bank.

135.    Arab Bank provided financial services and direct financial contributions to PIJ knowing that PIJ was designated in 1995 as Specially Designated Terrorist entity, as a designated Foreign Terrorist Organization in 1997, and as a Specially Designated Global Terrorist Entity in 2001.

**Al-Aqsa Martyrs' Brigade**

136.    The Al-Aqsa Martyrs' Brigade (Kata'ib Shuhada' al-Aqsa) ("AAMB") acts with the help of senior officers of other elements of the Palestinian Authority's armed entities, the Tanzim and Force 17 who have provided illegal weapons, training and intelligence to help carry out the attacks.

137.    The AAMB organized some of the most gruesome terrorist attacks in Israel, especially during the escalation of violence in 2001 and 2002. In that period, the al-Aqsa Martyrs' Brigade increased the level of its cooperation with other terrorist organizations,

142

including Hamas, PIJ and PFLP. A number of bombings and shootings were perpetrated by the AAMB, individually or in partnership with other terrorist groups.

138.    AAMB has committed numerous terrorist attacks, including several that have killed and injured American citizens.  Since September 2000, AAMB has conducted and taken credit for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed 23 people and injured approximately a hundred others and a string of other attacks that have killed more than 70 civilians and wounded more than five hundred (500) others.

139.    On April 2, 2002 Israel made public an invoice that was found among documents taken by Israeli troops in Arafat's Ramallah compound during Operation Defensive Shield. The invoice, titled "Financial Report" and dated September 16, 2001, appears to be a bill to the Palestinian Authority from the AAMB. It requests from Arafat's government payment for, among other things, electrical and chemical components for 30 bombs: "We need about 5-9 bombs a week for our cells in various areas." The payment was approved.

140.    AAMB recruited 15-year-old boys to carry out suicide bombing attacks.  AAMB promised the people they recruited for suicide bombings that payments would be made to their families after the attacks were conducted.

141.    Zakariyya Muhammad 'Abd Al-Rahman Zubeidi is head of the terrorist infrastructure of AAMB in the Jenin area.  In recent interviews with Israeli and foreign media, he has repeatedly stated he regards his orders as holy, and that he will "fight and not stop…" Zubeidi also admitted to a BBC correspondent that he had received money from the AAMB (his share of the $50,000 Fatah gives AAMB every month).

142.    The terrorist activities and ideology AAMB espouses are well-known throughout the Occupied Territories, Jordan, the Middle East and the world.  Its terrorist attacks are widely reported and the group publicly advertises its involvement in terrorist attacks.  AAMB publishes information for distribution in the Middle East including the Occupied Territories and Jordan and maintains a website which is available for the world to view.

143.    Furthermore, on March 27, 2002, pursuant to the authority of section 1(b) of Executive Order 13224 of September 23, 2001, the Deputy Secretary of State, acting under the authority delegated to him by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, has designated the AAMB (also known as the Al-Aqsa Martyrs Battalion) as a Specially Designated Global Terrorist ("SDGT").

144.    On March 27, 2002, pursuant to section 1(a)(ii)(A) of the Executive Order 12947 of January 23, 1995, the Deputy Secretary of State, acting under the authority delegated to him by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General determined that AAMB (also known as the Al-Aqsa Martyrs Battalion) has committed, or poses a serious risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East Peace Process.

145.    Arab Bank provided financial services and direct financial contributions to the AAMB knowing that the group was engaged in terrorist acts.  This financial support continued even after AAMB was designated as Specially Designated Global Terrorist entity and a Foreign Terrorist Organization.

**Popular Front for the Liberation of Palestine**

146.    The PFLP was founded on December 11, 1967 with the union of two left-wing Palestinian organizations. Its leaders were Wadi' Haddad (who later became responsible for

terrorist operations) and George Habash, the general secretary. The PFLP is a Marxist organization which advocates armed insurrection. It perpetrates show-case, media-oriented attacks, particularly the hijacking of planes, to bring the Palestinian cause to public attention.

147.    In 1971, under the leadership of Habash, the organization took a more pragmatic line. Nevertheless, the PFLP never agreed to recognize Israel and left the PLO after the acceptance of the "Stage Strategy" (June 1974) as adopted in Cairo by the Palestinian National Council. Although the PFLP continued its pragmatic line, it is still opposed to the Oslo accords and is critical of the Palestinian Authority, despite the fact that it made its peace with Arafat and returned to the ranks of the PLO.

148.    In May 2000, George Habash resigned as general secretary because of failing health and was replaced by Abu Ali Mustafa. Mustafa directed the organization to perpetrate terrorist attacks against Israel. He was killed in a targeted attack on August 21, 2001 in Ramallah and replaced by Ahmad Sadat. Sadat directed the assassination of Rehavam Ze'evi, Israeli Minister of Tourism (October 17, 2001). In the wake of Israeli and international pressure Sadat was arrested by the Palestinian Authority and is today in "custody" in Jericho. The PFLP's political leadership resides in the PA-administered territories and Syria, and a small operational-terrorist wing in the PA-administered territories (the Shaheed Abu 'Ali Mustafa Battalions).

149.    During the current violent confrontation the PFLP called for an armed insurrection and perpetrated a number of terrorist attacks despite the fact that its operational-terrorist wing is smaller than those of the other Palestinian terrorist organizations. It is party to the inter-organizational dialogues but refused to participate in the hudna when Abu Mazen was prime minister.

150.    In 1995 the PFLP was named a Specially Designated Terrorist Organization pursuant to Executive Order 12947. Two years later in 1997, like Hamas and PIJ, the PFLP was designated as an FTO.

151.    Arab Bank provided financial services and direct financial contributions to the PFLP knowing that the group has engaged and continues to engage in terrorist acts. This financial support continued even after the PFLP was designated as Specially Designated Terrorist entity and an FTO.

152.    Arab Bank and its leading shareholders have knowingly supported the terrorist, genocidal, and human rights atrocities described herein.

### The Mujahideen Committee and Historical Saudi Support for the *Intifada*

153.    The *intifada* has been supported financially through different mechanisms. In recent years, the Kingdom of Saudi Arabia has provided one of the most significant and systematic avenues of support. Historically and as a matter of state policy, the Kingdom of Saudi Arabia has morally, politically and financially supported the *intifada*. The de facto ruler of the Kingdom of Saudi Arabia, Crown Prince Abdullah has stated: "We, in the Kingdom, will not show any slackness in defending our brothers in Palestine led by my brother the *mujahid* [holy warrior], Yasser Arafat." In furtherance of this national policy, following the Arab-Israeli war in 1967, the Kingdom of Saudi Arabia formed the Popular Committee for Assisting the Palestinian Mujahideen (the "Mujahideen Committee") for the express purpose of "assisting the freedom fighters of Palestine," and "extending assistance to members of the families of the martyrs." In February 1994, King Fahd Ibn Abd Al-Aziz issued an updated directive to Prince Salman Ibn Abd Al-Aziz, the Governor of Riyadh who heads the Mujahideen Committee, to support the

Palestinians with a national fund-raising campaign in the Kingdom. The Mujahideen Committee provided the Palestinian Liberation Organization with millions of dollars.

154.    Terrorist groups interact and support one another in a matrix of international logistical, financial and sometimes operational terrorist activity. *See*, Matthew Levitt, "The Political Economy of Middle East Terrorism," *Middle East Review of International Affairs*, Vol. 6, No. 4 (December 2002).

155.    A task force on terrorist financing, sponsored by the Council on Foreign Relations, recently highlighted this interaction, noting: "[o]ther Islamic terrorist organizations, Hamas and Hizballah specifically, often use the very same methods-and even the same institutions-[as al-Qa'ida] to raise and move their money. And more recently, published reports suggest that al-Qa'ida has formed additional tactical, ad-hoc alliances with these terrorist organizations to cooperate on money laundering and other unlawful activities." *Id; citing,* Maurice R. Greenberg, Chair, "Terrorist Financing: Report of an Independent Task Force Sponsored by the Council on Foreign Relations," The Council on Foreign Relations, October 2002. In fact, while there is no shortage of examples of operational and logistical links between disparate militant Islamist groups, these interactions are most pervasive in the realm of financing.

156.    The same global interconnectedness concerning all Islamic terrorist groups is found in the activities of Hamas and PIJ. These groups share the same ideology and methodology to accomplish their purposes. The groups share logistical and tactical information, jointly conduct operations and terrorist attacks, and actively reap the benefits of a financial matrix. As the financial support is given as social or "charitable" donations, distinctions between various groups and their operational, military and political wings are fundamentally flawed.

157.    Other Palestinian terrorist groups such as the AAMB and the PFLP, though not Islamic in orientation, have served to benefit from the financial support that has been fed into the Palestinian territories since the outbreak of the Al-Quds Intifada. Possessing the same ultimate goal as their Islamic counterparts of eradicating the State of Israel, these groups have also engaged in a campaign of suicide bombings and other similarly egregious terrorist attacks against the Israeli civilian population. The families of those involved in these attacks have also received the support of funds emanating from the Arab Bank's coffers.

158.    The government of the United States reportedly opposed and condemned the funding of Hamas by Saudi individuals. In 1994, for example, President Clinton reportedly requested that Saudi Arabia stop providing financial support to the Palestinian uprising and to Hamas.

159.    In spite of this warning, the Kingdom of Saudi Arabia increased its support for the Palestinian uprising throughout the 1990s and into the new century, and openly and officially supported suicide bombings and other murderous attacks. Beginning in the mid-1990s, the official Saudi religious establishment began blessing suicide bombings and other murderous attacks by Hamas and other Palestinian terrorist organizations. In early May 2002, Saudi Arabia's Minister of Islamic Affairs publicly stated: "[t]he suicide bombings are permitted," adding that "the victims are considered to have died a martyr's death."

160.    Arab Bank knew that it was financially supporting terrorist attacks in Israel. Arab Bank assisted its customers by maintaining and facilitating an account dedicated to Hamas, and accounts maintained by Hamas NGO's. Arab Bank knew that individuals in Saudi Arabia were publicly collecting donations for terrorist attacks and Arab Bank provided material support to terrorist groups by facilitating the transfer of these funds. Through these acts, Arab Bank

financially supported genocide and human rights violations by assisting in and facilitating the financial incentivization of terrorism.

## IV.    The Saudi Committee for Aid to the Al Quds Intifada

161.    In order to further encourage, incite and make possible the second *intifada* – including its campaign of systematic suicide bombings and other murderous attacks – the Kingdom of Saudi Arabia in October 2000 established the Saudi Committee for Aid to the Al Quds Intifada ("Intifada Committee").  According to official Saudi sources, the purpose of the Intifada Committee was to support financially, among others, the families and dependents of Palestinian "martyrs."

162.    As noted above, the Al Quds Intifada erupted in late September 2000.  Almost immediately, the Kingdom of Saudi Arabia intentionally adopted and implemented a national policy decision to support financially the *intifada*.  On or about October 9, 2000 King Fahd Ibn Abdul Aziz issued directives to the governors of all administrative regions of Saudi Arabia to gather donations from the public to support the Al Quds Intifada, including through the Intifada Committee, a new entity established by the Saudi government pursuant to Royal Decree # 8636 on or around October 16, 2000.  The Intifada Committee was to be headed by Prince Nayef bin Abd Al-Aziz, the Interior Minister of Saudi Arabia and the half-brother of Saudi Crown Prince Abdullah.  According to a 2004 U.S. government report, the Intifada Committee "has served as the main conduit for Saudi financial and material aid to the Palestinian territories since its establishment."

163.    In late October 2000, the Arab League held an emergency summit in Cairo to discuss the second *intifada*.  At the summit, Saudi Crown Prince Abdullah proposed to multilateralize Saudi Arabia's financial support of the second *intifada*.  The Crown Prince told

the summit: "[o]ur support for our Palestinian brothers should not only be political and moral. It should include all possible [financial] means. Accordingly, we propose the establishment of a special trust under the name of the 'Al Quds Intifada Fund' with a capital of 200 million US dollars. This amount will be allocated to the families and education of the children of the Palestinian martyrs who sacrificed their lives in the struggle.... The Kingdom shall contribute 25% of the amount allocated [to the Al Quds Intifada Fund]." The Arab League adopted the Saudi proposal.

164.    In a letter dated October 23, 2000, addressed to the Secretary General of the United Nations, the Permanent Representative of Egypt to the United Nations notes: "The Al-Quds Intifadah Fund will have a capital of 200 million dollars to be allocated for disbursement to the families of Palestinian martyrs fallen in the Intifadah and for providing the means necessary for the care and education of their children."

165.    The Intifada Committee would thus be capitalized by both government funds and private donations. Whereas official funds from the Saudi and other Arab governments were collected in, among other institutions, the Islamic Development Bank, funds from the private donation campaigns launched in the Kingdom pursuant to royal decree were collected in special dedicated bank accounts in certain commercial banks located in the Kingdom.

166.    The private donation campaign was immediately highly successful. In October 2000, the Intifada Committee collected 150,000,000 Saudi *riyals* (SR) in the Riyadh region alone, according to published reports; and, in November 2000, according to published reports, "Saudi authorities were busy disbursing financial assistance to casualties and relatives of martyrs of the Al Quds Intifada in Palestine." As of early April 2001, according to Saudi Minister of

Finance and National Economy Dr. Ibrahim Al Assaf, cash donations from the people of Saudi Arabia to the Intifada Committee exceeded SR 240,000,000, or approximately $64 million.

167.    That same month, Saudi state-run television broadcast a "telethon" to benefit the Intifada Committee that included appeals from, among others, senior Saudi officials. That "telethon" reportedly raised over $100 million in donations. In Senate testimony on April 24, 2001, U.S. Secretary of State Colin Powell was asked whether he knew how the $100 million raised in the Spring 2001 telethon for the Intifada Committee was disbursed. He said: "We have seen some indications some of the money…would be going to elements of Hamas. So there are some troubling aspects as to how that telethon money would be distributed."

168.    Indeed, Dr. Assaf, the Saudi Minister of Finance and National Economy, stated around the time of the "telethon" that the Intifada Committee had pledged SR 20,000 [$5,333] to each Palestinian family that had suffered from martyrdom. He said that SR 124 million [$33.07 million] had been transferred for this purpose.

169.    The web page of the Royal Embassy of Saudi Arabia in Washington contained similar declarations. A March 20, 2001 posting read: "The fund… targets the families of victims of the *intifada* (i.e. the perpetrators). The Committee has pledged a sum of $5,333 to each family that has suffered from martyrdom. A total of $33.07 million has been transferred for this purpose, and to provide for the injured." An April 1, 2001 posting read: "Financial assistance is currently being provided to the families of those martyred."

170.    In a letter from Hamas to the Arab Summit reprinted in Al Rai Newspaper on March 27, 2001, Hamas writes:    "We hope that your decisions include the following…Supporting the endurance of the Palestinian people and its Intifadah with money and weapons and forming committees in all the Arab countries to support the Intifadah."

151

171.    In June 2001, Prince Nayef, Saudi Minister of the Interior, chaired the second meeting of the representatives to the Intifada Committee of the regions' governorates in Jeddah. At the meeting, representatives reviewed fundraising campaigns in various regions.    Prince Nayef announced that more than SR 160,709,000 had been provided to families of Palestinian "martyrs." According to published reports, he also urged citizens and residents to support the Intifada Committee.

172.    In July 2001, according to published reports, Prince Nayef directed the Intifada Committee to distribute SR 5.57 million to, among others, 28 families of "martyrs" and 29 Palestinian charity ("*zakat*") committees.    According to published reports, assistance to Palestinian charity committees was undertaken in coordination with large Saudi-based charities including the Muslim World League (MWL) and the World Assembly of Muslim Youth (WAMY).

173.    Prince Nayef further stated: "The [Intifada Committee] will continue to provide direct assistance to the families of Palestinian martyrs and those wounded while resisting the occupation."

174.    Accordingly, in April 2002, King Fahd chaired a meeting of the Council of Ministers that reviewed Saudi support for the Al Quds *intifada*. According to Saudi Minister of Information Dr. Fouad Ibn Abdul Salam Al Farsy, the Council of Ministers expressed satisfaction with the support of the Saudi people for the Al Quds *intifada*, citing contributions to the Intifada Committee. At the same time, in connection with the Council of Ministers meeting, another Royal decree was issued to launch a fundraising campaign to support the *intifada*. The fundraising campaign was announced by Saudi Television and Radio, and an eleven-hour telethon was held on Saudi Arabian Television to benefit the Intifada Committee. A statement

released in connection with the telethon and fundraising campaign specified that "The [Intifada Committee] will continue to provide direct assistance to the families of Palestinian martyrs and those wounded while resisting the occupation."

175.    The money raised by the Intifada Committee in the telethon and from numerous other donations was delivered to Palestinian martyrs and their families, and the families of prisoners, though a process developed in cooperation with Arab Bank.

176.    In May 2002, following that "telethon," Mubarak Al Biker, Executive Manager of the Intifada Committee, explained in an English-language press report in *Arab News* that the Intifada Committee made no distinction in paying families of suicide bombers and families of Palestinians killed by Israel military action.

177.    In May 2003, a report issued by the Intifada Committee indicated that the Intifada Committee had raised SR 658,091,218, of which SR 411,181,881 had been spent to support, among others, the families and dependents of Palestinian "martyrs," including suicide bombers, the injured and the imprisoned.

178.    The Intifada Committee kept records of its disbursements to the families of Palestinian "martyrs." It maintained personnel in the Palestinian territories to help identify beneficiaries and supervise remittances to families. In some cases, the Intifada Committee's local personnel worked in coordination with organizations in the West Bank and Gaza that were, according to the U.S. Department of Justice, front organizations for Hamas and other Palestinian terrorist groups. In order to insure that only families of "martyrs" received disbursements, the Intifada Committee required beneficiaries to present registration cards to local branches of the Arab Bank to receive remittances and documented each remittance with a unique identifying reference number.

179.    The Intifada Committee posted on its website voluminous records relating to its remittances through spring 2002.  The Intifada Committee's archived website reveals that the Intifada Committee provided financial support to, among others, the families of approximately 67 Palestinian terrorists who perpetrated attacks against Israeli, U.S. and other civilians from October 26, 2000 through March 20, 2002, including the plaintiffs to this action and their survivors.   According to a 2004 U.S. government report:  "These individuals include suicide bombers and gunman who were killed during actual and attempted attacks inside Israel and the Palestinian territories."

180.    These documented payments to the families of terrorists incentivized and made possible scores of future terrorist attacks by Palestinian terrorist organizations.

181.    One fifteen (15) year old boy who was captured by Israeli soldiers before he was able to blow himself up in a suicide mission at an Israeli checkpoint was asked by a BBC Reporter whether AAMB promised him anything in return for carrying out the attack.  The little boy responded:  "Of course they did. They told me, once you carry out the operation and the soldiers come and demolish your home, we'll stand by your parents and rebuild your house and give them money."

182.    The following chart perfectly illustrates the connexity between the funding and terror attacks in Israel:

| YEAR | Terror Attacks Israel (suicide and other bombs) | Popular Committee for Assisting the Mujahideen | Committee for the Al-Quds Intifada & Al-Aqsa Funds | TOTAL |
|---|---|---|---|---|
| 1998 | 1 | 3,600,000 | 0 | 3,600,000 |
| 1999 | 0 | 3,490,000 | 0 | 3,490,000 |

154

| 2000 | 4 | 8,418,348 | 0 | 8,418,348 |
| 2001 | 36 | 9,473,628 | 14,454,190,000 | 14,463,663,628 |
| 2002 | 44 | 266,575,791 | 350,000,000 | 616,575,791 |
| 2003** | 22 | 7,226,384 | 720,003,150 | 727,229,534 |
| **TOTALS** | | **298,784,151** | **15,524,193,150** | **15,822,977,301** |

Before Account 98 was opened, very few terrorist attacks occurred in Israel. The tremendous increase in the number of bombings which occurred is directly attributable to the establishment of Account 98 which was crucial to the development of the terrorist infrastructure.

183.    Even the sanitized Arabic version of the website continues to state that the committee's activities include: "support of the families of martyrs and wounded, as well as the handicapped, orphans and prisoners, as well as homeowners whose houses were destroyed and landowners whose land was bulldozed, as well as support of a number of Palestinian social institutions and sponsorship of needy families …"

184.    In practice, the Saudi Committee constitutes a professional fundraising apparatus intended to subsidize the Intifada Al Quds, i.e., to subsidize the Palestinian terror campaign and to bankroll Hamas and the PIJ and their related front organizations in the West Bank and Gaza. These goals are accomplished in two ways, both of which depend on the knowing participation and substantial assistance of the defendant Arab Bank.

185.    The first goal is accomplished by providing a comprehensive benefit of $5,316.06 for the families of Palestinian terrorists and guaranteeing payments to terrorists and their beneficiaries whenever a terrorist is killed.

186.    This benefit not only provides benefits for specific members of preferred terrorist organizations such as Hamas, but is intended as a benefit available to terrorists belonging to any terrorist organization or to none at all, thereby incentivizing and rewarding all terrorists in Israel

and eliminating the potential distinctions between terrorist groups, between individual (freelance) terrorists and the more established terrorist cells, and between the secular and radical Islamist terrorist organizations.

187.     Through the program administered by Arab Bank, the Saudi Committee paid and transmitted benefits to at least approximately 200 fallen "martyrs" in the first year of its existence alone. As of November 2001, the Saudi Committee paid more than forty-two million dollars ($42,000,000) to terrorists and/or their beneficiaries. According to Arab Bank's Chief Banking Officer, Shukry Bishara, Arab Bank has transmitted $90,000,000.00 to Palestine on behalf of the Saudi Committee to "institutions and individuals alike."

188.     Accordingly, the Bank's financial and ideological support for the Second Intifada is a matter of public record and its participation in diligently implementing the terrorist financing scheme is knowing and deliberate.

189.     Indeed, in its original website, the Saudi Committee openly declared that its funds were transmitted and distributed to the families of martyrs through local branches of the Arab Bank in Palestine. Although it has since been removed from the internet, the original archived webpage located at www.alquds-saudia.org/indexa.htm provided a list under the caption: "What has been done with your donations?"

190.     The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

191.     Arab Bank makes it possible for the terrorist groups to transcend physical obstacles and to provide an organized and professional distribution system that literally underwrites the terror campaign.

192.    The Saudi Committee and local Hamas charitable front organizations have publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website, all of which are known to or should be known to Arab Bank and all of which are calculated to — and do — reach terrorists and potential terrorists. For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been injured during the Second Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a Hamas charitable front organization in Ramallah announced that the Saudi Committee "requests that the families of the martyrs whose names are listed herein to go to a branch of the Arab Bank in their place of residence to receive the tenth payment offered by the Saudi Committee in the amount of $5,316.06 ..."

193.    In the spring of 2002, around the same time the Israeli Defense Forces (IDF) launched Operation Defensive Shield, a military action in the West Bank directed against Palestinian terrorists and their supporters, the Intifada Committee ceased updating on its website

records relating to remittances to the families of Palestinian "martyrs." As described below, Operation Defensive Shield yielded, among other things, detailed financial records specifying how money from the Intifada Committee was distributed to Palestinian "martyrs" and their families and dependents. The captured records corroborate the records maintained by the Intifada Committee and posted, at one time, on its website.

## V.     The Banking Channels

### Background

194.    As noted above, commencing in late 2000, the Saudi government launched a national fundraising effort to encourage Saudi citizens to donate money to support the second *intifada* and its attendant suicide bombings and terror campaign, including specifically through donations to the Mujahideen Committee and the Intifada Committee.

195.    A dedicated account known as Account 98 was established at several commercial banks located in Saudi Arabia to accept donations to the Intifada Committee. The following banks located in Saudi Arabia, among others, opened Accounts 98: the Saudi-American Bank, the Saudi-British Bank, the Saudi-Dutch Bank, Saudi-French Bank, National Commercial Bank and Arab National Bank (the "Banks").

196.    Certain of the Banks are or were during relevant periods managed by Western joint venture partners.

197.    Through Account 98, the Banks collected donations to the Mujahideen Committee and the Intifada Committee. The web page of the Intifada Committee indicated that donations to the Intifada Committee would be accepted and collected in Account 98. In a statement released in October 2000, Saudi Prince Salman Bin Abdulaziz, the governor of the Riyadh region and the head of the Mujahideen Committee, identified certain of the Banks as

sponsors of Account 98, encouraged citizens to deposit donations in Account 98 and noted that it would be possible to do so at branches of these banks. According to published accounts, the SR 150,000,000 raised in October 2000 alone to support the Intifada Committee "was deposited in the unified account number 98."

198.    In this manner, the Banks collected donations in support of the Intifada Committee. Widespread publicity surrounded efforts to raise private donations for the Intifada Committee, including, as described above, television and newspaper accounts (including, as early as February 2001, newspaper accounts that listed the names of Palestinian prisoners and the names of Palestinian "martyrs" who received financial benefits), along with at least two fund-raising "telethons" on Saudi state-run television.

199.    During this period, the Banks transferred or caused to be transferred Account 98 funds to, among other places, concentration accounts at National Commercial Bank, whose longstanding controlling family, the Bin Mahfouz family, has reportedly and allegedly directly or indirectly sponsored, aided, abetted and encouraged international terrorism.

**The Distribution Process**

200.    Once collected, transferred and concentrated in this manner, such funds were delivered to their intended beneficiaries through a structured financial path:

- ◆ The Intifada Committee used information provided by welfare societies and official Palestinian sources to prepare a list of potential beneficiaries. The beneficiaries included "the families of martyrs" and "the families of prisoners".

- ◆ The Intifada Committee verified the names of the beneficiaries, their contact information, and their injury with Palestinian officials.

- ◆ The Intifada Committee then coordinated with the National Arab Bank. Specifically, the Intifada Committee opened a bank account in the beneficiary's name and then deposited a

standard amount of Saudi riyals or U.S. dollars into the account.

♦ As the Intifada Committee raised funds in Saudi Riyals, which cannot conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), Arab Bank converted those funds into U.S. dollars through its New York branch and then routed the funds back to its local branches.

♦ After the deposits were transferred to Arab Bank branches in the West Bank and the Gaza Strip, the money was withdrawn by the beneficiaries.    The Intifada Committee's original website posed this question: "What has been done with your donations?" The answer: "Opening a bank account for every entitled [Palestinian] through Arab Bank in Palestine."

201.    Account 98 funds were also transferred to accounts maintained by charity ("*zakat*") committees at Arab Bank branches in the West Bank and Gaza acting on behalf of, and under the control of, designated Foreign Terrorist Organizations such as Hamas.  For example, such funds were transferred to accounts maintained for the Tulkarem Charity Committee at Arab Bank's branch in Tulkarem, including Account # 9070-500010-6/500.  According to the U.S. Department of Justice, the Tulkarem Charity Committee is a Hamas front organization, and it is in fact controlled by Hamas operatives.

202.    Arab Bank actively participated in a formalized process which required the families of "martyrs" to obtain an official certification of their deceased relative's status as a bona fide "martyr", replete with an individualized identification number.

203.    Arab Bank, in turn, provided detailed lists consisting of the names of the "martyrs", personal information and details concerning the date and manner of death and other information provided to it by the Saudi Committee and representatives of the leading terrorist groups via their charitable front organizations.

204.    Arab Bank, in consultation with the Saudi Committee and local representatives of Hamas, finalized the lists, maintained a database of persons eligible to receive payments and opened a dollar account for each beneficiary. Every eligible Palestinian family was encouraged to collect the terrorism payment through a local branch of the Arab Bank in the West Bank or Gaza, including through advertisements placed in Palestinian newspapers in 2001 and 2002 by the Intifada Committee and Hamas-controlled *zakat* committees. According to the Intifada Committee's 2001 annual report, monies were deposited directly into the accounts of 986 individual beneficiaries, including specifically the families of Palestinian suicide bombers, with each "victim" receiving SR 10,000.

205.    If the family chose to collect the payment, the families were required to present to the bank an "official" certification from the Palestinian Authority (replete with a unique identification number) establishing the bona fides of the "martyr."

206.    If the documentation proved satisfactory, Arab Bank issued a receipt to the designated recipient of the martyrdom payment. For example, Dia A-Tawil perpetrated a suicide bombing attack on March 27, 2001 on behalf of Hamas. He was designated Palestinian Authority Martyr No. 449. His father, Hussien Mohamed Favah Tawil, presented the "official" certification to the defendant, Arab Bank, and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah.

207.    In this manner, Arab Bank provided substantial material support to Palestinian terrorist organizations, including designated Foreign Terrorist Organizations or their fronts, and provided a meaningful incentive, both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance."

161

208.    Arab Bank had actual knowledge that the terrorist financing system it helped to develop, and its knowing and intentional receipt, transfer, and disbursement of Intifada Committee funds, substantially assisted and facilitated Hamas, PIJ, AAMB and PFLP attacks.

209.    Arab Bank knowingly advanced the methods and means by which Hamas and other Palestinian terrorist organizations sought to carry out their objectives.

210.    Arab Bank management and employees were knowing participants in contributing to Account 98 and Account 90.    Arab Bank management and employees donated funds in support of the Al-Quds Intifada.

211.    Arab Bank's support of, and commitment to, the violent goals of terrorist organizations are embodied by the personal commitment of Arab Bank's Chairman, Abdul Majeed Shoman who, according to published reports in *Al Bayan* (a newspaper in the United Arab Emirates), traveled to Qatar to a meeting to raise money to finance and support the intifada.

212.    In 1984, the Shoman family that owns and controls Arab Bank Plc published a biography of Mr. Abdulhameed Shoman (the bank's founder) entitled The Indomitable Arab in which he consistently set forth his antipathy towards Jews, Zionists and the State of Israel.    He also clearly describes his abhorrence for the Untied States, which he claimed to have once admired, but then loathed because of its support for Israel.

213.    Prior to the establishment of Arab Bank, its founder Abdulhameed Shoman described his great anger toward Zionists, Jews, and others whom he believed stood in the way of the growth of the Arab economy.    In his biography he is quoted as saying that "…within a few years Zionism will have grown strong enough to control the entire economy.    I believe that all business dealings with the Jews – buying, selling or banking transactions – are damaging to our country's best interests."

162

214.    In his final speech before four hundred employees of Arab Bank, Mr. Shoman also explained his hatred for Americans that had developed over the years:

> I liked the Americans. I once bore their nationality, and gathered my fortune in their country. But since they started to help the Zionists and supply them with arms to fight us, I have come to detest them. It was not the Jews, but the Americans, who fought us.

215.    Mr. Shoman's son, Abdul Majeed Shoman is presently the chairman of the Arab Bank and a vocal supporter of the Second Intifada.

216.    He is, for example, the chairman of the Popular Committee in Support of the Palestinian Intifada which was established during the first Intifada in 1987-1988. The Committee managed to raise approximately eight millions Jordanian Dinar (JOD 8,000,000) or approximately $11,000,000 for "martyrs' families," paying 1,000 JOD ($1,400) to each martyr's family and 300 JOD ($425) to each Palestinian injured in the violence. From 1995 to 2000, the Popular Committee raised an additional 1,200,000 JOD for the martyrs' families of the first Intifada.

217.    On November 22, 2000, Arab businessmen, held a meeting with Yassir Arafat, at which time a new entity was formed, the Fund for Support of the Persistence of the Palestinian People to further bankroll the Palestinian Authority and the Second Intifada.. Defendant Arab Bank pledged $2,000,000.00. Mr. Shoman pledged $500,000.00, personally.

218.    The Shoman family's altruism towards the Second Intifada continued in June of 2001 when the Cultural Center of the Abdul Hamid Shoman Institute launched an exhibition on the subject of "the martyrs of the Palestinian Intifada" The stated purpose of the exhibit was to "honor to the martyrs of the blessed al-Aqsa intifada" by means of conveying the human and

spirited image of their lives. The exhibit featured presentations of the martyrs' personal belongings that had been collected, such as clothing and "tools"

219.    In a published report in July 2000 in the Jordanian daily newspaper *Addustour* Abdul Majeed Shoman is described as favoring the destruction of the State of Israel.

220.    A published report in the October 2000 issue of the Jordanian daily newspaper *Addustour*, stated that both the management and employees of Arab Bank were donating funds to support the *intifada*.

221.    *Al Quds* Newspaper on December 12, 2000, noted a memo from the Jordanian Banks Association which confirmed the continuation of talks with the Arab League as to how best to transfer the money donated for the Al Quds Intifadah to those who qualified for it in Palestine. The donations and money were deposited by the League in an account at Arab Bank, Cairo, before transferring it to Palestinian territories.

222.    Arab Bank knew that Account 98 and Account 90 funds were raised, deposited, transferred and disbursed through a system that proximately resulted in the creation of a self-sustaining terrorist financing system.

223.    For example, following a supermarket bombing by an 18-year-old Palestinian girl, a Saudi telethon reportedly raised more than $100 million for the Palestinians. Similarly, Colonel Munir al Maqda, also known as Abu Hassan, used the Arab Bank to funnel Iranian funds to AAMB. Starting in 2001, over $40,000 was transferred to an Arab Bank account for use in purchasing weapons, expenses, and bomb-making materials. Further, a handwritten letter by Abu Mazen, the PA Representative to the Kingdom of Saudi Arabia, on December 30, 2000, to Saudi Prince Salman, complains that Saudi donations in the Gaza Strip were going to an organization called al-Jamiya al-Islamiya (the Islamic Society), which Abbas explained "belongs

164

to Hamas." Indeed, in the past Hamas openly revealed the use it made of the Arab Bank by soliciting donations and posting account numbers on its Internet site.

224.    Arab Bank also knew that the widespread and systematic campaign of suicide bombings resulted in an increased pattern of suicide bombings. It is a matter of public record that there have been at least 40,000 Account 98 or Account 90 transactions since October of 2000. From September 2000 through September 2004, there have been just shy of 140 suicide attacks, and another 440 or more suicide attacks thwarted. Widely reported statistics available to Arab Bank further establish the widespread impact of suicide bombings on Plaintiffs and other Israeli civilians: between 2000 and 2002 alone, suicide attacks represented only 1% of the total number of terrorist attacks in Israel, but caused approximately 44% of the Israeli casualties. And since September 2000, Palestinian terrorists have attempted approximately 21,000 attacks, resulting in more than 6,000 casualties, including over 1,000 civilian deaths.

225.    Arab Bank's public statements that it "never participated in any activity knowingly that could lead to violence" is belied by the fact that the Executive Manager of the Intifada Committee, who has stated to Arab News that "we support the families of Palestinian martyrs, without differentiating between whether the Palestinian was a bomber or was killed by Israeli troops." Further, the Intifada Committee's website has long contained records reflecting that money being funneled through Arab Bank as described above went to over 60 families whose main breadwinner(s) were known Palestinian militants who carried out indiscriminate terrorist attacks, including suicide bombers and gunmen who were killed during actual and attempted attacks:

> ◆  Said Hassan Hussein Hotari - Said Hassan Hussein Hotari - identified as suicide bomber in June 1, 2001, attack on Dolphinarium nightclub in Tel Aviv. Hamas claimed responsibility. The attack resulted in the killing of 22 people

including Katrin Talker, Jan Blum, and Ryisa Nemirovsky. The attack also resulted in 83 wounded including plaintiffs Maxim Malchenko, Yitzhak Alazraki, and Marina Zipunov.

♦ Izzedine Shahil Ahmed Masri - identified as suicide bomber in August 9, 2001 attack on Sbarro pizza restaurant in Jerusalem. Hamas claimed responsibility. This attack resulted in the death of 15 Israelis including Tamar Masangisar, Michal Raziel, and Tzvika Golombek. There were also 110 wounded, including plaintiffs Michal Ozeri Chazan, Oz Moshe Chazan, Aviel Shalom Chazan, and Yaffa Lev.

♦ Muhammad Ahmed Abdul Rahman Daraghmeh - identified as suicide bomber in March 2, 2002 attack on Orthodox Jewish neighborhood in Jerusalem. The AAMB claimed responsibility. Those killed in this attack were Lidor Ilan, Oriya Ilan, Jacob Avraham Eliyahu, Tzafia Eliyahu, Shuli Nehamed, Eliyahu Nehamed, Shlomo Nehamed, Gafnit Nehamed, Shiraz Nehamed, and Liran Nehamed. The attack resulted in 50 wounded, including plaintiffs Yehuda Markowitz, Bat-El Hagby, Zion Dahan, Zvi Aharon, Solomon Cohen, Liora Tedgi, Nissim Tedgi, and Yechiel Bornstein.

226. Most of the Intifada Committee records assigned to individuals whose names match or closely resemble those of suicide attackers list "assassination" as the cause of death—however upon information and belief other records credit "martyrdom." Other records indicate that the individuals they refer to were killed during a "martyrdom operation."

## VI.  Discovery and Condemnation

### Operation Defensive Shield

227. In April 2002 as part of Operation Defensive Shield, Israeli Defense Forces raided the offices of the Tulkarem Charitable Society.

228. The Tulkarem Charitable Society is one of the Hamas civilian infrastructure's most prominent West Bank institutions and also supports the movement's operational-terrorist activities; it was therefore outlawed by Israel in 2002. It was also targeted by the Palestinian

Authority, as early as December 2001, when the PA froze the funds transferred from the Al-Hussein branch of the Arab Bank in Jordan to the Tulkarem Charitable Society's account.

229.    For several years the Tulkarem Charitable Society has been headed by Hamas activist Hosni Hassan Hussein al-Khawajah. Born in 1928 near Tulkarem, he was a teacher, school principal and merchant. His signature was found on documents captured at the Society's offices in Tulkarem in February 2004. The three authorized signatures are those of individuals also identified with Hamas.

230.    The Tulkarem Charitable Society purports to conduct a wide range of social, religious and economic activities.  In actuality, the Tulkarem Charitable Society is supported by organizations abroad which provide aid for the infrastructure of Hamas, PIJ, AAMB, and PFLP in the PA-administered territories, including the following well known Hamas front organizations:  the Holy Land Foundation for Relief and Development in the United States ("HLF"), World Assembly of Muslim Youth ("WAMY") in Saudi Arabia, the Palestinian Relief and Development Fund in Britain ("Interpal"), Committee for Palestinian Charity and Aid ("CPSP") in France, and the International Relief Fund for the Afflicted and Needy in Canada ("IRFAN").

231.    The Tulkarem Charitable Society received funds from these organizations and from other institutions all over the world, including many Arab countries, in support of the terrorist infrastructure.  Arab Bank facilitated many of these transfers through its branches around the world including its New York branch.

232.    Among the documents recovered in the raid, Israeli officials discovered a spreadsheet detailing how $545,000 received from the Intifada Committee was allocated to families of Palestinian suicide bombers and other terrorist operatives.

233.    The spreadsheet identifies, among other things, suicide bombers, by name, the date of the bombing for which the suicide bomber was responsible and the number of people killed in the bombing, as well as other Hamas operatives directly involved in planning or executing terrorist attacks.

234.    The spreadsheet and other captured documents corroborate information from the Intifada Committee's own detailed and voluminous records.  For example, the following suicide bombers, whose families received payments from the Intifada Committee, are identified on the spreadsheet and in records contained on the Intifada Committee's archived website:

(1)    Ahmed Amer Hamdan Aliyan who committed a "suicide act on Netanya" on March 4, 2001 in which plaintiffs Ronit Fuchs and Yehuda Doron were injured;

(2)    Mahmoud Ahmed Mahmoud Marmash who committed a "suicide act" at the Hasharon Mall in Netanya on May 18, 2001, in which Vladislav Sorokin was killed and plaintiffs Olesya Sorokin and Alexander Sorokin injured;

(3)    Abdel Rahman Hamad, a Hamas operative, and Said Hassan Hussein Hotari, the suicide bomber, who were responsible for the June 2001 bombing of the Dolphinarium disco in Tel Aviv in which Katrin Talker, Jan Blum, and Ryisa Nemirovsky were killed and plaintiffs Maxim Malchenko, Yitzhak Alazraki, and Marina Zipunov injured;

(4)    Fadi Attalluh Yusuf Amer, who committed a suicide attack at the Neveh Yamin/Kfar Sabba Junction on March 28, 2001 in which Eliran Rozenberg was killed and plaintiffs Hannanel Touito and Refael Sommer injured;

(5)    Izzedine Shahil Ahmed Masri, the suicide bomber responsible for the attack at the Sbarro restaurant in Jerusalem on August 9, 2001 in which Tamar Masangisar, Michal Raziel, and Tzvika Golombek were killed and plaintiffs Michal Ozeri Chazan, Oz Moshe Chazan, Aviel Shalom Chazan, and Yaffa Lev injured;

(6)    Osama Eid Baher, one of the suicide bombers responsible for an attack on Ben Yehuda Street in Jerusalem on December 1, 2001 in which Yossi El Ezra, Ido Cohen, Jacob Israel Danino, and Golan Turgeman were killed and plaintiffs Ortal Ganon, Avyatar Ben Lulu, Menashe Chamu, and Sharon Gili Hefetz injured;

(7)     <u>Assem Yusuf Rihan</u>, who was among those responsible for the attack on a No. 189 Dan bus near the entrance to the Emmanuel on December 12, 2001 in which Yair Amar, Ester Avram, and Avraham Nachman Nitzani were killed and plaintiffs Chana Sieradzki, Eliyahu Nachman Klein, Moshe Hagiel, Uriel Zadok, and Dvora Zarfati injured;

(8)     <u>Muhammad Ahmed Abdul Rahman Daraghmeh</u>, who was the suicide bomber responsible for the attack near a *yeshiva* in Beit Yisrael neighborhood of Jerusalem on March 2, 2002 in which Lidor Ilan, Oriya Ilan, Jacob Avraham Eliyahu, Tzafia Eliyahu, Shuli Nehamed, Eliyahu Nehamed, Shlomo Nehamed, Gafnit Nehamed, Shiraz Nehamed, and Liran Nehamed were killed and plaintiffs Yehuda Markowitz, Bat-El Hagby, Zion Dahan, Zvi Aharon, Solomon Cohen, Liora Tedgi, Nissim Tedgi, and Yechiel Bornstein injured.

235.    Another document mentions a PIJ suicide bomber named Murad 'Abd al-Fatah al-Asl, who on September 9, 2001, perpetrated the suicide bombing attack at the Beit Lid intersection, near Netanya. Through the Arab Bank, his family was compensated for his death, the razing of their house and the incarceration of his cousin. The total sum was 20,105 Jordanian dinars [approximately $29,000] and was paid to them through the Bank 's Tulkarem branch.

236.    Another document showed the transfer of money to the family of PIJ operative Rami Muhammad Jamil Mutlaq Ghanem, who perpetrated the suicide bombing attack at the London Café in Netanya (in the central part of the country) on March 30, 2003; 34 civilians were injured in the attack. His family received the exceptional sum of around $5,000 - $7,000 for his action and approximately $14,000 to compensate for the razing of the family's house, in addition to their increased monthly allowance.

237.    An Israeli Defense Forces Military Report noted that "according to the captured documents, the [Saudi] Committee was aware that the funds it transferred were paid to families of terrorists who perpetrated murderous attacks in Israeli cities, in which many Israelis were killed and wounded."

238.    In each case, the beneficiaries received the funds through the Tulkarem branch of the Arab Bank. According to other documents confiscated from the offices, the bank manages all the society's financial business, including the receipt of funds from external sources and the payment of funds to the families of shaheeds, wounded, wanted and imprisoned Palestinian terrorists.

239.    As a result, funds collected, received and disbursed by Arab Bank directly supported, encouraged, incited and made possible the carrying out of suicide bombings and other murderous attacks by providing payments aggregating in the millions of dollars to the families and dependants of suicide bombers, prisoners and other terrorist operatives.

240.    Based upon the foregoing, Arab Bank knew or should have known that funds that it distributed to finance the activities of the Intifada Committee would ultimately be disbursed to support the infrastructure for, and activities of, Palestinian terrorist organizations, including designated Foreign Terrorist Organizations such as Hamas, PIJ, AAMB, PFLP, and their other front organizations.

**United States' Condemnation of Terror Attacks**

241.    The United States government has affirmed the causal effectiveness of such payments in fomenting acts of terror.   A November 2001 Federal Bureau of Investigation memorandum concerning Hamas funding notes that through such financial support, "Hamas provides a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populaces…"

242.    The United States, at the highest levels, has also specifically condemned the provision of financial support to families of suicide bombers.   U.S. Secretary of State Colin Powell has stated:   "I think it's a real problem when you incentivize in any way suicide

bombings." U.S. Vice President Richard B. Cheney cited such financial support as a factor for the U.S. military campaign against the regime of Saddam Hussein, noting in late 2003 that the former Iraqi regime "cultivated ties to terror," by, among other things, "making payments to the families of suicide bombers in Israel." In July 2004, Vice President Cheney similarly criticized Hussein for "providing financial rewards to the families of suicide bombers in Israel." And in July 2004, President George W. Bush said that Hussein "def[ied] the world" by, among other things, "subsidiz[ing] the families of suicide bombers."

243.    On July 27, 2004, the United States criminally indicted the Holy Land Foundation for Relief and Development and various individuals for violations of federal law (including the Anti-Terrorist Act) based on their provision of material support to the families of Palestinian suicide bombers through, inter alia, *zakat* committees, including specifically, among others, the Tulkram Charity Committee. The indictment charges that the defendant "provided financial support to the families of Hamas martyrs, detainees and activists…[I]n this manner, the defendant effectively rewarded past, and encouraged future, suicide bombings and terrorist activities on behalf of Hamas." The indictment further stated: "This type of support was critical to Hamas' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure solidifying Hamas' presence."

**Palestinian Authority Condemnation of Terror Attacks**

244.    In addition to condemnation of these terror attacks by the United States government, the government of the Palestinian Authority has also joined in condemning these attacks.

245.    Yasser Arafat, the former Chairman of the Palestinian Authority, publicly declared the "necessity to completely stop these attacks…to preserve the high national interest."

He further stated, "I personally, and the Palestinian Authority, are completely against it (the attacks)."

**Universal Condemnation of Financing of Terrorism**

246.    The international community has universally condemned the financing of terrorism thus incorporating this offense into the law of nations pursuant to the ATCA.

247.    The following international conventions and/or United Nations Security Council Resolutions support the premise that the financing of terrorism is incorporated into the law of nations:

     i. The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GA OR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999) (In force Apr. 2002);

     ii. Resolution 1267 (1999) of October 15, 1999 on the freezing of the funds and other financial resources of the Taliban.

     iii. Resolution 1269 (1999) of October 19, 1999 calling upon states to take steps to deny those who finance terrorist acts safe haven.

     iv. Resolution 1333 (2000) of December 19, 2000 on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization.

     v. Resolution 1363 (2001) of July 30, 2001 on the establishment of a mechanism to monitor the implementation of measures imposed by Resolutions 1267 (1999) and 1333 (2000).

     vi. Resolution 1373 (2001) of September 28, 2001 on threats to international peace and security caused by terrorist acts, and mandating the formation of the Counter-Terrorism Committee.

     vii.    Resolution 1377 (2001) of November 12, 2001 calling upon states to implement fully Resolution 1373 (2001).

     viii.    Resolution 1390 (2002) of January 16, 2002 effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

     ix. Resolution 1455 (2003) of January 17, 2003 on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002).

    x. Resolution 1456 (2003) of January 29, 2003 reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"; stating that states must "bring to justice those who finance…terrorist acts"; and urging states to become parties to the 1999 Terrorism Financing Convention; calling on Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001).

    xi. Resolution 1526 (2004) of January 30, 2004 calling upon states to implement fully Resolution 1373 (2001), and measures to improve the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

    xii.   Resolution 1535 (2004) of March 26, 2004 calling upon states to implement fully Resolution 1373 (2001).

**Universal Condemnation of Genocide**

248.    The international community has universally condemned the crime of genocide thus incorporating this offense into the law of nations pursuant to the ATCA.

249.    The following international conventions and/or United Nations Security Council Resolutions support the premise that the crime of genocide is incorporated into the law of nations:

    i. The Convention on the Prevention and Punishment of the Crime of Genocide ("Convention on Genocide"), 78 U.N.T.S. 277;

    ii. The Statute of the International Criminal Tribunal for the Former Yugoslavia ("Statute of the ICTY"), Art. 4 (adopted by the U.N. Security Council in Resolution No. 808 (May 3, 1993)), U.N. Doc. S/25704;

    iii. The Statute of the International Criminal Tribunal for Rwanda ("Statute of the ICTR"), Art. 2 (adopted by the U.N. Security Council in Resolution No. 955), U.N. Doc. S/INF/50 (1994);

    iv. The Rome Statute of the International Criminal Court, U.N. GAOR, 52d Sess., Annex II, at 4, U.N. Doc. A/CONF.183/9 (1998), Art. 6.

**Universal Condemnation of Crimes Against Humanity**

250.    The international community has universally condemned crimes against humanity thus incorporating this offense into the law of nations pursuant to the ATCA.

173

251.    The following international conventions and/or United Nations Security Council Resolutions support the premise that the act of crimes against humanity is incorporated into the law of nations:

i.      The Charter of the International Military Tribunal, Aug. 8, 1945, art. 6I, 59 Stat. 1546, 1547, E.A.S. NO. 472, 82 U.N.T.S. 284;

ii.     The Statute of the International Criminal Tribunal for the Former Yugoslavia, Art. 5;

iii.    The Statute of the International Criminal Tribunal for Rwanda, Art. 3;

iv.     The Rome Statute of the International Criminal Court, Art. 7.

## COUNT ONE

## FINANCING OF TERRORISM IN VIOLATION OF THE LAW OF NATIONS

252.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

253.    The financing of suicide bombings and other murderous attacks committed by PIJ, Hamas, AAMB, and PFLP against Plaintiffs and the unarmed members of the civilian Israeli population constitutes a crime in violation of the law of nations.

254.    The crime of terrorist financing rests on a clear and definite norm of international law which is universally accepted by the civilized world.  The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GAOR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999) (In force Apr. 2002)("Convention") is declaratory of existing international law. It has been signed by 132 states, and as of December 8, 2004 was in force among 117 states. *See* http://untreaty.un.org/ENGLISH/Status/Chapter_xviii/treaty11.asp. The Convention condemns the funding of terrorism and requires that the provision or collection

of funds for terrorist offenses be criminalized. The United States ratified this Convention on June 26, 2002.

255. The Convention follows the precedents set by numerous other sources of international law that reflect the universal condemnation of terrorist financing.

256. First, the Convention defines offenses by incorporating eleven existing anti-terrorism conventions. Thus, a Convention offense includes providing or collecting funds for any act falling within the International Convention for the Suppression of Terrorist Bombings, adopted by the General Assembly of the United Nations Jan. 12, 1998, G.A. Res. 164, U.N. GAOR 52nd Sess., U.N. Doc. A/RES/52/164 (1998), 37 I.L.M. 249 (1998) (In force May 23, 2001) ("Bombing Convention"), which itself has been ratified by 123 nations. The United States ratified the Bombing Convention on June 26, 2002.

257. Convention offenses also encompass providing or collecting funds for "any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in hostilities in a situation of armed conflict, when the purpose of the act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

258. Second, the Convention supplements existing international authority in the form of U.N. Security Council Resolutions which reflect the international community's collective denouncement of terrorist financing:

- Resolution 1267 (1999) of October 15, 1999 on the freezing of the funds and other financial resources of the Taliban.

- Resolution 1269 (1999) of October 19, 1999 calling upon states to take steps to deny those who finance terrorist acts safe haven.

175

- ◆ Resolution 1333 (2000) of December 19, 2000 on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization.

- ◆ Resolution 1363 (2001) of July 30, 2001 on the establishment of a mechanism to monitor the implementation of measures imposed by Resolutions 1267 (1999) and 1333 (2000).

- ◆ Resolution 1373 (2001) of September 28, 2001 on threats to international peace and security caused by terrorist acts, and mandating the formation of the Counter-Terrorism Committee.

- ◆ Resolution 1377 (2001) of November 12, 2001 calling upon states to implement fully Resolution 1373 (2001).

- ◆ Resolution 1390 (2002) of January 16, 2002 effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

- ◆ Resolution 1455 (2003) of January 17, 2003 on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002).

- ◆ Resolution 1456 (2003) of January 29, 2003 reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"; stating that states must "bring to justice those who finance...terrorist acts"; and urging states to become parties to the 1999 Terrorism Financing Convention; calling on Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001).

- ◆ Resolution 1526 (2004) of January 30, 2004 calling upon states to implement fully Resolution 1373 (2001), and measures to improve the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

- ◆ Resolution 1535 (2004) of March 26, 2004 calling upon states to implement fully Resolution 1373 (2001).

259.   U.N. Security Council Resolution 1373 was unanimously adopted under Chapter VII of the U.N. Charter.   Under Article 25, decisions taken by the Security Council under Chapter VII of the Charter are legally binding on all members.

260.    Resolution 1373 is unequivocally directed at the prevention, prosecution, and punishment of the financing of terrorism, and characterizes acts of terrorism as threats to international peace and security.  By characterizing acts of terrorism as threats to international peace and security, the Security Council is entitled to take the collective measures (or "sanctions") envisioned by Chapter VII of the United Nations Charter. The measures that the Council decides to take in these circumstances are mandatory for all the members of the United Nations by virtue of Articles 25 and 48 of the Charter.

261.    Under Resolution 1373, "all States shall...prevent and suppress the financing of terrorist acts" and "criminalize the wilful provision or collection, by any means, directly or indirectly, of funds by their nationals or in their territories with the intention that the funds should be used, or in the knowledge that they are to be used, in order to carry out terrorist attacks." States are equally bound to "[e]sure that any person who participates in the financing" of terrorism "is brought to justice."  Resolution 1373's prohibition against "acts, methods, and practices of terrorism" which are "contrary to the purposes and principles of the United Nations" – including knowingly financing, planning and inciting terrorist acts – is declaratory of the fact that terrorist financing is contrary to existing Treaty obligations of member states as expressed in the purposes and principles of the U.N. Charter, which all member states are obliged to honor.

262.    World condemnation of terrorist financing is equally reflected in various regional conventions, which prohibit the financing of terrorist acts.  *See* Annex to Resolution No.: 59//26P; 1999 Convention of the Organization of the Islamic Conference on Combating International Terrorism, Art. 3; 1999 OAU Convention on the Prevention and Combating of Terrorism (Algiers, July 14, 1999), Art. 3; 1998 Arab Convention for the Suppression of Terrorism (Cairo, April 1998), Art. 3.

263.    Terrorist financing is likewise defined with a specificity sufficiently comparable to international law violations that were familiar when the ATCA was enacted.

264.    Consistent with its condemnation of terrorism financing, the world community has also joined in defining who can be held liable.  The Convention explicitly provides that liability for terrorist financing reaches those that directly or indirectly provide or collect funds with the intention or knowledge that the funds will be used to carry out a defined terrorist offense, regardless of whether the funds were actually used.  Specifically, the Convention reaches every accomplice and every person who organizes or directs others in the terrorist financing effort.

265.    Furthermore, legal entities may be held civilly liable for the offenses set out in the Convention.  This comports with the general international consensus embodied in the Bombing Convention, which also reaches all persons who "participate[] as an accomplice" in a terrorist bombing or "organizes others to commit them or in any other way contributes to their commission."

266.    Arab Bank aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law, to wit, terrorist financing, by directly or indirectly providing funds to PIJ, Hamas, AAMB, and PFLP with the intention or knowledge that those funds would be used to carry out an offense as defined by the Convention, the Bombing Convention and international law:

   i. Starting on or about October, 2000, PIJ, Hamas, AAMB, and PFLP engaged in numerous terrorist bombings that were part of a systematic and widespread attack on a civilian population, in which they murdered and seriously injured Plaintiffs and several thousand innocent Israeli civilians, in furtherance of the

overarching goal of toppling Israel and persecuting and completely destroying Plaintiffs and the Israeli population.

ii.    PIJ's, Hamas', AAMB's, and PFLP's suicide bombings and other murderous attacks were intended to cause death or serious or serious bodily injury to Plaintiffs and other Israeli civilians not taking part in the hostilities in a situation of armed conflict. By its nature and context, and as evidenced by the professed goals of PIJ, Hamas, AAMB, and PFLP, suicide bombings and other murderous attacks are designed to destroy and intimidate the Israeli population and topple Israel.

iii.    Arab Bank regularly accepted millions of dollars in deposits from state sponsored charities, official state donations, and private contributions, with actual knowledge and awareness that these same funds were raised and deposited for the sole purpose of supporting Palestinian genocidal murderers and maimers and their families; routed these same deposits into bank accounts created and maintained by government mandate and official government policy; transferred funds from those accounts to other participating banks; and disbursed those funds to, among others, Palestinian genocidal murderers and maimers and their families, as well as the families of prisoners, who were members of PIJ, Hamas, AAMB, and PFLP that engaged in suicide bombings against Plaintiffs and other Israeli civilians.

iv.    At all times, Arab Bank knew that its receipt, transfer, and disbursement of Account 98 and Account 90 funds were being paid to families of members of PIJ, Hamas, AAMB, and PFLP, and that these same FTOs carried out suicide

179

bombings and other murderous attacks against Plaintiffs and other Israeli and non-Israeli civilians.

v.     At all times, Arab Bank knew that its receipt, transfer, and disbursement of Account 98 and Account 90 funds and monetary awards for the families of suicide bombers were twice as large as those given to those families of mere prisoners and provided an incentive to PIJ, Hamas, AAMB, and PFLP members to engage in suicide bombings.

vi.    Arab Bank's conduct further provided organizational incentives to PIJ, Hamas, AAMB, and PFLP to continue to plan, and operate suicide bombings. Given the evidence that the Intifada Committee Account 98 and Account 90 funds were earmarked for the families of prisoners and those killed while perpetrating terrorist attacks, Arab Bank incentivized and contributed to suicide bombings.

vii.    Arab Bank knew that the Account 98 and Account 90 funds that were raised, deposited, transferred and disbursed through a system it helped to develop materially contributed to the creation of a self-sustaining a system of terrorist financing, suicide bombings and other murderous attacks.

viii.    Therefore, Arab Bank aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law within the meaning of the Convention, the Bombing Convention and the law of nations prohibiting terrorist financing.

267.    In the alternative, Arab Bank aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law, to wit, terrorist financing, by directly or

indirectly providing funds to PIJ, Hamas, AAMB, and PFLP with the intention or knowledge that those funds would be used to carry out an offense as defined by the Convention, the Bombing Convention and international law, as follows:

268.    Starting on or about October, 2000, PIJ, Hamas, AAMB, and PFLP engaged in suicide bombings and other murderous attacks involving the use of explosives, incendiary weapons, and other lethal devices which were designed to cause death and serious bodily injury.

      i.    PIJ's, Hamas's, AAMB's, and PFLP's suicide bombings and other murderous attacks also involved the intentional delivery, placement, discharge, and/or detonation of explosives, incendiary weapons, and lethal devices in public places, State, government, and public facilities, and in public transportation system(s), including buses.

      ii.    PIJ's, Hamas's, AAMB's, and PFLP's suicide bombings and other murderous attacks constitute a violation of international law as they constitute an offense under the Bombing Convention.

      iii.    Arab Bank regularly accepted millions of dollars in deposits from state sponsored charities, official state donations, and private contributions, with actual knowledge and awareness that these same funds were raised and deposited for the sole purpose of supporting Palestinian genocidal murderers and maimers and their families; routed these same deposits into bank accounts created and maintained by government mandate and official government policy; transferred funds from those accounts to other participating banks; and disbursed those funds to, among others, Palestinian genocidal murderers and maimers and their families, as well as the families of prisoners, who were

members of PIJ, Hamas, AAMB, and PFLP that engaged in suicide bombings and other murderous attacks against Plaintiffs and other Israeli civilians.

iv.     At all times, Arab Bank knew that its receipt, transfer, and disbursement of Account 98 and Account 90 funds were being paid to families of members of PIJ, Hamas, AAMB, and PFLP, and that these same FTOs carried out suicide bombings and other murderous attacks against Plaintiffs and other Israeli civilians.

v.     At all times, Arab Bank knew that its receipt, transfer, and disbursement of Account 98 and Account 90 funds and monetary awards for the families of suicide bombers were twice as large as those given to those families of mere prisoners and provided an incentive to PIJ, Hamas, AAMB, and PFLP members to engage in suicide bombings and other murderous attacks.

vi.     Arab Bank's conduct further provided organizational incentives to PIJ, Hamas, AAMB, and PFLP to continue to plan, and operate suicide bombings and other murderous attacks.  Given the evidence that the Intifada Committee Account 98 and Account 90 funds were earmarked for the families of prisoners and those killed while perpetrating terrorist attacks, Arab Bank incentivized and contributed to suicide bombings and other murderous attacks.

vii.     Arab Bank knew that the Account 98 and Account 90 funds that were raised, deposited, transferred and disbursed through a system it helped to develop materially contributed to the creation of a self-sustaining a system of terrorist financing, suicide bombings and other murderous attacks.

viii.     Therefore, Arab Bank aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law within the meaning of

the Convention, the Bombing Convention and the law of nations prohibiting terrorist financing.

269.    Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Arab Bank's conduct.

**WHEREFORE,** Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again engaging in the financing of terrorism in violation of the law of nations.

## COUNT TWO

### AIDING AND ABETTING, COMPLICITY, PARTICIPATING IN A JOINT VENTURE, AND/OR RECKLESS DISREGARD TO ENGAGE IN ACTS OF GENOCIDE IN VIOLATION OF THE LAW OF NATIONS

270.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

271.    Genocide has been universally recognized as a clear and definite norm of international law which is universally accepted by the civilized world and such conduct is so widely condemned that it has achieved the status of a universally recognized or *jus cogens* violation, and, therefore, is a violation of the law of nations such that the commission of genocide by a party subjects it to liability to aliens in United States courts under the ATCA.

272.    The Convention on the Prevention and Punishment of the Crime of Genocide ("Convention on Genocide"), 78 U.N.T.S. 277 adopted in 1948 and ratified by more than 120

nations further defines "genocide" as: "[a]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (a) killing members of the group; (b) causing serious bodily injury or mental harm to members of the group; (c) deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part." The Convention goes on to note that "Persons committing genocide shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals."

273. The most recent examples of the international community including the United States re-adopting the Convention on Genocide's standard definition of genocide are the International Criminal Tribunal of the Former Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda ("ICTR"). *See* Statute of the International Criminal Tribunal for the Former Yugoslavia ("Statute of the ICTY"), Art. 4 (adopted by the U.N. Security Council in Resolution No. 808 (May 3, 1993)), U.N. Doc. S/25704; Statute of the International Criminal Tribunal for Rwanda ("Statute of the ICTR"), Art. 2 (adopted by the U.N. Security Council in Resolution No. 955), U.N. Doc. S/INF/50 (1994). The definition contained within the Statute of the ICTY and the Statute of the ICTR expand upon that articulated by the Convention on Genocide by criminalizing conduct that "[i]mpos[es] measures intended to prevent births within the group" and "[f]orcibly transferring children of the group to another group."

274. The international community has also adopted this expanded definition of genocide with the Rome Statute of the International Criminal Court ("The Rome Statute"). *See* The Rome Statute, U.N. GAOR, 52d Sess., Annex II, at 4, U.N. Doc. A/CONF.183/9 (1998), Art. 6. The Rome Statute has not been ratified by the United States for reasons unrelated to the definition of genocide; however, its adoption of definitions universally accepted within the

184

international community through the Statute of the ICTY and the Statute of the ICTR shows how this definition of genocide has become part of the "law of nations."

275.    Genocide is a violation of the Law of Nations actionable under the ATCA for private actors. *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (cited approvingly in *Sosa v. Alvarez-Machain*, 124 S.Ct. 2739, 2766 n.20 (2004).

276.    Furthermore, On November 4, 1988 the Genocide Convention Implementation Act of 1987 (the Proxmire Act), Pub. L. 100-606, was signed into law by President Ronald Reagan.  As stated in the text of Senate Resolution 307 (107th Congress, 2nd Session), by this action, the United States Code (18 U.S.C. § 1091) was amended "to criminalize genocide under the United States law."  Senate Resolution 307 further called upon "the people and Government of the United States to rededicate themselves to the cause of bringing an end to the crime of genocide (as postulated under international law and with passage of this act under US law)."

277.    The ten year campaign of terror carried out by extremist groups including but not limited to Hamas, AAMB, PIJ, and the PFLP against Israelis and Jews is nothing short of a genocidal campaign of terror.

278.    Hamas' founding charter, titled "Mithaq Harakat al-Muqawamah al-Islamiyya" dated August 18, 1988, pledges the group to carry out armed struggle in order to destroy Israel and its Jewish citizens and to establish an Islamic Palestinian state in place of Israel.  This genocidal ideology is laid out in a *hadith* – a traditional recitation of the sayings of the Prophet Mohammad and his companions not recorded in the Quran – which was adopted as Article 7 of its charter, and it reads:  "The time will not come until Muslims will fight the Jews (and kill them); until the Jews hide behind rocks and trees, which will cry: O Muslim!  The Jew is hiding behind me, come on and kill him!"

279.    Article 8, the slogan of the Hamas movement: "Allah is its goal, the Prophet its model, the Qur'an its Charter, jihad its path, and death for the cause of Allah its most sublime belief."

280.    Article 13 states: "There is no solution for the Palestinian question except through jihad. All initiatives, proposals and international conferences are a waste of time and vain endeavors."

281.    And Article 28 states: "Israel, Judaism and Jews challenge Islam and the Muslim people: 'May the cowards never sleep.'"

282.    After his release from an Israeli prison and return to Gaza in October of 1997, Sheikh Ahmed Yassin, the founder and spiritual head of Hamas, declared that Israel must "disappear from the map." He added: "we have an aim and an enemy, and we shall continue our jihad against the enemy. A nation without a *jihad* is a nation without a purpose."

283.    Abdel Majeed Shoman, chairman of the Arab Bank, was interviewed in the Jordanian newspaper *Al-Dustour* in July 2000. In this interview, Shoman echoed the views of Yassin and was quoted as stating, "for him a just solution would be the return of all Palestinian lands to their legitimate historical residents, i.e., the Palestinian people and the Arab nation. Shuman said he was against a Palestinian compromise [based on] a partial return [which included] the loss of some land, and that the Jews had no right to the land of Palestine."

284.    The U.S. Department of Justice has described Hamas's charter as stating "that the purpose of Hamas is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad…Hamas is opposed to any peaceful solution to the Palestinian territorial conflict, as such a proposition is at odds with Hamas' stated goal of annihilating the State of Israel…."

285.    With the outbreak of the second *intifada*, Hamas and other Palestinian terrorist organizations – notably PIJ, the AAMB, and the PFLP – intensified the terror campaign of widespread and systematic suicide bombings and other murderous attacks within Israel, the West Bank and Gaza.  Like Hamas, PIJ, AAMB, and PFLP are similarly committed to the destruction of the State of Israel. According to some estimates, attempted attacks have numbered approximately 21,000 and have targeted Jews and other civilians, resulting in the death and injury of thousands of individuals, mostly civilians.

286.    Hamas, PIJ, AAMB, and PFLP are engaged in a campaign of genocide. These groups have killed citizens and non-citizens of the State of Israel and caused serious bodily injury and mental harm to citizens and non-citizens of the State of Israel with the intent to destroy the State of Israel.  These acts fit squarely within the well-settled international law definition of genocide as set forth in the Genocide Convention.

287.    Article 3 of the Convention on Genocide notes that among the acts which are punishable are "(a) Genocide, (b) Conspiracy to commit genocide; (c) Direct and public incitement to commit genocide; (d) Attempt to commit genocide; and (e) Complicity in genocide."

288.    The concept of complicit liability for conspiracy or aiding and abetting is well-developed in international law.  Under International Law one is responsible for a crime which is committed when that party provides "knowing practical assistance or encouragement which has a substantial effect on the perpetration of the crime."

289.    Under the Allied Control Council Law No. 10 (Dec. 20, 1945), criminal liability extends not only to principals who committed acts of genocide or war crimes but also those who were connected with any plans or enterprises involving the commission of such crimes.

290.    Under The Agreement for the Prosecution and Punishment of Major War Criminals of the European Axis, and Establishing the Charter of the Military Tribunal, Article , 82 U.N.T.S. 279, "leaders, organizers, instigators, and accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such a plan."

291.    Cases emanating from the ICTY and the ICTR have confirmed that aiding and abetting is a concept duly ingrained in international law to provide a colorable claim pursuant to the jurisdiction conferred by the ATCA.

292.    In 1793, the first among equals of the Founding Fathers President George Washington himself proclaimed that "whatsoever of the citizens of the United States shall render himself liable for punishment...under the law of nations, by committing, aiding or abetting hostilities...will not receive the protection of the United States, against such punishment."

293.    In 1795, the Attorney General of the United States echoed George Washington's proclamation: "The government does not seem bound to do more than has already been done by the President, who, by his proclamation of the 22nd of April, 1793, warned all citizens of the United States against all such proceedings" and went on to cite the proclamation.

294.    In 1807, chief Justice Marshall wrote in the famous opinion of *Ex Parte Bollman and Ex Parte Swartwout* in the trial of two of Aaron Burr's co-conspirators that: "if war be actually levied, that is, if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose, all those who perform any part, however minute, or however remote from the scene of the action, and who are actually leagued in the general conspiracy, are to be considered as traitors."

295.    General federal common law also recognizes complicit liability under theories of Joint Venture liability, Agency, and Reckless Disregard.

296.    The Comments to the *Restatement (Second) of Torts* § 876 state, "Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance. If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act.

297.    Under Joint Venture liability, each member of the joint venture is liable for the acts of its co-venturers.  By allowing Hamas to maintain bank accounts and supervising the disbursement of funds to the families of genocidal murderers and maimers from Hamas, PIJ, AAMB, PFLP and others, the Arab Bank, PLC, had entered into a joint venture with these actors thus subjecting it to liability for the acts of its co-venturers.  In this instance, these were acts conducted in furtherance of a plan of genocide against the State of Israel devised by Hamas, PIJ, AAMB, PFLP and others.  This plan was known by the Arab Bank, PLC, and the acts performed by Arab Bank, PLC, were performed with the intent to further the genocidal goals of its co-venturers.

298.    Under reckless disregard, Arab Bank, PLC would be liable to Plaintiffs if it may be shown that the bank acted in the face of an unjustifiably high risk of harm to Plaintiffs or that it had actual knowledge of the substantial risk posed to Plaintiffs which it disregarded to the detriment of the Plaintiffs. Here, Arab Bank, PLC was well aware of the genocidal goals of PIJ, Hamas, AAMB, and PFLP.  Nevertheless, it provided funds to the families of the genocidal

murderers and maimers of these organizations thus incentivizing additional acts in furtherance of these genocidal goals with disregard for the substantial risk posed to the Plaintiffs.

299.    Arab Bank aided and abetted, intentionally facilitated, was complicit in, and/or recklessly disregarded the planning, preparation or execution of genocide by providing organized and systematic financial and other practical assistance, encouragement or moral support which had a substantial effect on the perpetration of genocide, with knowledge that its actions would assist Hamas, PIJ, AAMB, and PFLP in the commission of genocide.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again contributing to facilitating or aiding and abetting a campaign of genocide against the people of the State of Israel in violation of the law of nations and to prevent the Defendant's reckless disregard of the campaign of genocide against the people of the State of Israel in violation of the law of nations.

## COUNT THREE

### AIDING AND ABETTING, INTENTIONALLY FACILITATING, AND/OR RECKLESSLY DISREGARDING CRIMES AGAINST HUMANITY IN VIOLATION OF INTERNATIONAL LAW

300.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

301.    The suicide bombings and other murderous attacks committed by PIJ, Hamas, AAMB, and PFLP against Plaintiffs and the unarmed Israeli population constitute a crime against humanity in violation of the law of nations.

302.    Strong condemnation of crimes against humanity rests on a clear and definite norm of international law which is universally accepted by the civilized world. See, e.g, Charter of the International Military Tribunal, Aug. 8, 1945, art. 6I, 59 Stat. 1546, 1547, E.A.S. NO. 472, 82 U.N.T.S. 284; Statute of the ICTY, Art. 5; Statute of the ICTR, Art. 3; see also The Rome Statute, Art. 7.

303.    Crimes against humanity are likewise defined with a specificity sufficiently comparable to international law violations that were familiar when the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, was enacted. The core elements of a crime against humanity in violation of international law, as codified in the above sources and recognized in international law generally, are murder and other heinous acts against human life, physical welfare, and dignity that are undertaken as part of a widespread or systematic attack against a civilian population. These crimes are punishable whether committed in peacetime or in war.

304.    Starting on or about October, 2000, PIJ, Hamas, AAMB, and PFLP engaged in numerous suicide bombings and other murderous attacks that were part of a systematic and widespread attack on a civilian population, in which they murdered and seriously injured Plaintiffs, several thousand innocent Israeli civilians and foreign visitors to Israel, in furtherance of the overarching goal of toppling Israel and persecuting and completely destroying Plaintiffs and the Israeli population.

305.    PIJ's, Hamas', AAMB's, and PFLP's suicide bombings and other murderous attacks were systematically committed. Their suicide bombings and other murderous attacks

required a high degree of careful planning, coordination, funding, and orchestration by and between PIJ, Hamas, AAMB, PFLP and others, such as Arab Bank, PLC. Suicide bombings and other murderous attacks also involve recruitment, the provision of explosives, the targeting of Plaintiffs and other members of the Israeli civilian population, and payments to families of suicide bombers.

306.   PIJ's, Hamas', AAMB's, and PFLP's suicide bombings and other murderous attacks were widespread in nature. Plaintiffs and the entire Israeli civilian population were targeted and thousands of unarmed innocents were injured or killed. Suicide bombings and other murderous attacks have taken place in public and private locations, during the day and night, and have involved attacks against men and women, both young and old, and children. In addition to the suicide bombings that were carried out, hundreds of similar suicide bombings have been thwarted prior to implementation.

307.   PIJ's, Hamas', AAMB's, and PFLP's suicide bombings and other murderous attacks therefore constitute a violation of the law of nations as they are crimes against humanity.

308.   Arab Bank, PLC knowingly, intentionally and directly aided and abetted, intentionally facilitated, and/or recklessly disregarded crimes against humanity in violation of the law of nations. Aiding and abetting and/or joint venture and reckless disregard are actionable claims pursuant to the ATCA. *See supra.* paras. 254-264.

309.   Arab Bank helped to develop the financial system that provided monetary incentives to members of PIJ, Hamas, AAMB, and PFLP to engage in crimes against humanity.

310.   Arab Bank regularly accepted millions of dollars in deposits from state-sponsored charities, official state donations, and private contributions, with actual knowledge and awareness that these same funds were raised and deposited for the sole purpose of supporting

Palestinian genocidal murderers and maimers and their families; routed these same deposits into bank accounts created and maintained by government mandate and official government policy; transferred funds from those accounts to other participating banks; and disbursed those funds to, among others, Palestinian genocidal murderers and maimers and their families, as well as the families of prisoners, who as members of PIJ, Hamas, AAMB, and PFLP, committed crimes against humanity against Plaintiffs, other Israeli civilian and foreign visitors to Israel.

311.    At all times, Arab Bank knew that its receipt, transfer, and disbursement of Account 98 and Account 90 funds were being paid to families of members of PIJ, Hamas, AAMB, and PFLP, and that these same militants carried out indiscriminate suicide bombings and other murderous attacks against Plaintiffs, other Israeli civilians and foreign visitors to Israel.

312.    Arab Bank aided and abetted, intentionally facilitated and/or recklessly disregarded the planning, preparation or execution of the crimes against humanity by providing organized and systematic financial and other practical assistance, encouragement or moral support which had a substantial effect on the perpetration of crimes against humanity, with knowledge that their actions would assist Hamas, PIJ, AAMB, and PFLP in the commission of crimes against humanity.

313.    Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Arab Bank's conduct.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary

and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again engaging in crimes against humanity against the people of the State of Israel in violation of the law of nations.

## COUNT FOUR

### ASSISTING IN THE INTENTIONAL INJURY OF OTHERS BY A THIRD PARTY

314.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

315.    Defendant knew, or should have known, that the funds deposited in the specific accounts established and maintained by it, and discussed herein throughout, were being used to support, encourage, entice and make possible the suicide bombings and other murderous attacks described herein.

316.    Through both its actions and its inactions, Defendant allowed its facilities to be used by Hamas, AAMB, PIJ, PFLP, and other terrorist organizations and their supporters in order to support, encourage, entice and make possible the intentional and foreseeable acts of those groups including, but not limited to, its campaign of genocide, war crimes, crimes against humanity, and other heinous acts of international terrorism described herein.

317.    Defendant's actions and inactions served to create an unreasonable risk of harm to others including but not limited to the Plaintiffs, victims of the suicide bombings and other murderous attacks, and their families, through the foreseeable acts of Hamas, AAMB, PIJ, PFLP and other terrorist organizations and their supporters.

318.    At the time of its conduct, Defendant realized or should have realized the likelihood that the accounts were being used in such a way, and that Hamas, AAMB, PIJ, PFLP

and other terrorist organizations, as well as their supporters, might avail themselves of the opportunity to commit such a tort or crime.

319.    As a result of the foregoing Plaintiffs have been damaged in an amount not less than the statutory amount of $75,000.

**WHEREFORE**, Plaintiffs demand judgment as follows:

1.    Against Defendant, for compensatory damages in favor of each of the Plaintiffs in an amount to be determined at trial but not less than $75,000.

2.    Against Defendant in favor of all Plaintiffs who are not U.S. nationals for punitive damages in an amount sufficient to prevent the Defendant from ever again supporting, encouraging, enticing, rewarding, carrying-out and making possible terrorist or similar acts.

3.    Against Defendant in favor of Plaintiffs for any and all costs incurred in connection with the prosecution of this action, including reasonable attorney's fees.

4.    Such other and further relief as justice requires.

## COUNT FIVE

### RECKLESS DISREGARD

320.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

321.    Defendant knew, or should have known, that the funds deposited in the specific accounts established and maintained by it, and discussed herein throughout, were used to support, encourage, entice and make possible the suicide bombings and other murderous attacks

described herein.  As a result, Defendant was aware, or should have been aware, of a risk so great that it was highly probable that serious harm and/or death could result from their acts in collecting and distributing such funds.

322.     Defendant recklessly disregarded this known and substantial risk thereby setting in motion the suicide bombings and other murderous attacks that were foreseeable to Defendant and which were the direct and proximate cause of the injury and/or death of Plaintiffs and/or their decedents.

323.     As a result of the foregoing Plaintiffs have been damaged in an amount not less than the statutory amount of $75,000.

**WHEREFORE**, Plaintiffs demand judgment as follows:

2.       Against Defendant, for compensatory damages in favor of each of the Plaintiffs in an amount to be determined at trial but not less than $75,000.

3.       Against Defendant in favor of all Plaintiffs who are not U.S. nationals for punitive damages in an amount sufficient to prevent the Defendant from ever again supporting, encouraging, enticing, rewarding, financing, carrying-out and making possible terrorist or similar acts.

4.       Against Defendant in favor of Plaintiffs for any and all costs incurred in connection with the prosecution of this action, including reasonable attorney's fees.

5.       Such other and further relief as justice requires.

## COUNT SIX

## WRONGFUL DEATH

324.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

325.    Plaintiffs herein bring this consolidated action pursuant to F.R.C.P. 42 for the wrongful death proximately caused by the Defendant engaging in, materially supporting or sponsoring, financing, aiding and abetting, scheming and/or otherwise conspiring to commit or cause to occur acts of murder and wrongful death, specifically, the suicide bombings and other shockingly egregious acts of international terrorism discussed herein.

326.    Surviving family members or estates of those wrongfully killed are entitled to recover damages from Defendant for these illegal and wrongful deaths. The family members or estates are entitled to recover full damages incurred, as fair and just compensation for the injuries resulting from these wrongful deaths.    Those responsible for these deaths must be held accountable for the losses incurred.

327.    The injuries and damages suffered by the Plaintiffs were proximately caused by the intentional, malicious, reckless, criminal, violent, grossly negligent or negligent acts of the Defendants as described herein.

328.    As a direct and proximate result of the wrongful deaths of the decedents, their heirs and families have suffered financially and been deprived of all future aid, income, assistance, services, comfort, companionship, affection and financial support of their loved ones.

329.    As a direct and proximate result of Arab Bank's conduct in knowingly, intentionally and directly aiding and abetting, intentionally facilitating, and/or recklessly disregarding the intentional commission of murderous suicide bombings by PIJ, Hamas, AAMB,

and PFLP against plaintiffs resulting in the wrongful death of decedents, the heirs and families of those murdered suffer and will continue to suffer permanent, physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries.

330.    As a further result of intentional, willful, wanton, malicious, reckless, criminal, negligent, wrongful, illegal and tortious acts and conduct of Arab Bank, the Plaintiffs have incurred actual damages including but not limited to ongoing medical expenses related to psychological trauma, physical injuries, and other expenses and losses for which they are entitled to full and fair recovery.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendant in an amount in an amount to be determined by a jury, not less than the statutory amount of $75,000, plus interest, costs, fees and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate and deter Defendants from ever again committing acts of international terrorism.

## COUNT SEVEN
### SURVIVAL

331.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

332.    As a result of the intentional, malicious, reckless, criminal, grossly negligent and negligent acts of Defendant as described herein, those killed in the murderous attacks described herein, were placed in a severe, often prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury and assault.  Those murdered suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of

pending death and physical and emotional trauma, intentionally inflicted physical pain. Decedents were mentally, physically and emotionally damaged, harmed, trapped, and falsely imprisoned prior to their personal physical injury and deaths.

333.    As a result of Defendant's criminal and tortious conduct, those killed suffered damages including pain and suffering, severe trauma, fear, anxiety, permanent physical and emotional distress, ultimate loss of life and life's pleasures, companionship and consortium, loss of family, career, earnings and earning capacity, loss of accretion to their estates, and other immeasurable items of damages to be shown at trial. Plaintiffs herein seek and are entitled to survival damages for those tortured and killed in these suicide bombings and other murderous attacks.

**WHEREFORE, Plaintiffs demand judgment in their favor against Arab Bank, in an amount to be determined by a jury, not less than the statutory amount of $75,000, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts.**

## COUNT EIGHT

### NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

334.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

335.    Arab Bank knowingly, intentionally and directly aided and abetted, intentionally facilitated, and/or recklessly disregarded the intentional commission of suicide bombings and other murderous attacks by PIJ, Hamas, AAMB, and PFLP which resulted in the decedents'

deaths and substantial emotional injuries to the personal injury plaintiffs, and their family members.

336.    Arab Bank intended or knew or should have known, that its conduct would lead to the killing of or injury to innocent persons and resulting severe emotional distress. Arab Bank intended, knew, or should have known that the suicide bombings and other murderous attacks committed by PIJ, Hamas, AAMB, and PFLP would kill, maim, and/or permanently injure innocent people, leaving devastated family members to grieve for their losses with ongoing physical, psychological and emotional injuries and ongoing post traumatic stress disorder.

337.    The actions of Arab Bank were unconscionable and done with an intentional, malicious, willful, and/or reckless disregard for the rights and lives of those murdered, those injured, and the surviving family members.

338.    As a direct and proximate cause of Arab Bank's intentional misconduct and/or reckless disregard for human life, Plaintiffs have suffered and will continue to suffer severe, debilitating, permanent emotional, physical and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counseling and long-term care, particularly for all minor Plaintiffs.

339.    Arab Bank, by engaging in this intentional, unlawful conduct, intentionally, grossly negligently, or negligently inflicted emotional distress upon the Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Arab Bank in an amount to be determined by a jury, not less than the statutory amount of $75,000, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing acts of international terrorism.

### JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Respectfully Submitted,

_____
Ronald L. Motley, Esq. (SC Bar No. 4123)
Jodi Westbrook Flowers, Esq. (SC Bar No. 66300)
Donald Migliori, Esq. (RI Bar No. 4936; MA Bar
    No. 567562; and MN Bar No. 0245951)
Michael Elsner, Esq. (NY ME-8337; VA 41424;
    SC 72893)
John M. Eubanks, Esq.
MOTLEY RICE, LLC
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000


_____/S/_____
Allan Gerson, Esq.  (DC Bar No. 327494)
ATTORNEY AT LAW
2131 S Street
Washington, DC 20008
Tel:  (202) 966-8557

201

Of Counsel

Jason McCue, Esq.
H20 LAW
40-43 Chancery Lane
London WC2A 1JQ
United Kingdom

David Mena, Esq.
DAVID MENA & CO. LAW OFFICES
35, Jabotinski Street
Ramat-Gan, Israel  52511

Gavriel Mairone, Esq. (IL 6181698)
MANN& MAIRONE
11 East Adams Street, Suite 1600
Chicago, IL  60603

Rehov Ha-Chilazon 12
Ramat Gan, Israel

Lord Dan Brennan
Matrix Chambers
Gray's Inn
London WC1R 5LN
United Kingdom

Attorneys for Plaintiffs

Dated:  August 8, 2008